[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 10-13442 ; 11-11122
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 17, 2012
JOHN LEY
CLERK

D.C. Docket No. 1:08-cv-21569-FAM


HOLSTON INVESTMENTS INC. B.V.I.,
ALBERT P. HERNANDEZ,

Plaintiffs - Appellees,

versus

LANLOGISTICS, CORP.,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 17, 2012)

Before TJOFLAT, PRYOR, and FAY, Circuit Judges.

PER CURIAM:

LanLogistics Corp. raises two issues on appeal. The first issue requires us to determine the citizenship of a dissolved corporation for purposes of diversity jurisdiction. The second issue involves whether summary judgment was appropriately entered where there may have been a genuine issue of material fact. We affirm the district court's holding as to the first issue, but reverse and remand for factual findings on the second issue.

## I.

LanLogistics owned a company named LanBox Inc., which facilitates delivery of consumer purchases between customers in the United States, Latin America, and Europe. In 2007, LanLogistics sold LanBox and two other companies to Paul Gartlan ("Gartlan"). Gartlan paid $3.5 million for the three companies. The parties allocated $450,000 of the purchase price to LanBox.

LanLogistics's sale of LanBox breached a contract it previously formed with Holston Investments Inc. B.V.I. ("Holston"). In 2004, LanLogistics had promised Holston a right of first refusal, but LanLogistics never gave Holston an opportunity to match Gartlan's offer to purchase LanBox.

Alleging diversity jurisdiction, Holston sued in federal court. Holston is a

citizen of Florida. LanLogistics was incorporated in Delaware and maintained its corporate headquarters in Miami, Florida, but by the time Holston filed suit, LanLogistics had dissolved and formally forfeited its authority to conduct business in Florida.[1]

After two years of litigation and final judgment had been entered on behalf of Holston, LanLogistics challenged the district court's subject-matter jurisdiction and moved to vacate the judgment. In support, LanLogistics asserts it is a citizen of Florida, like Holston, and that the parties are therefore not diverse under 28 U.S.C. § 1332.

## II.

Whether a court has subject-matter jurisdiction to hear a matter is a question of law that we review *de novo*. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1340 (11th Cir. 2011). A court's application of law to facts also receives *de novo* review. *United States v. Frank*, 599 F.3d 1221, 1228 (11th Cir. 2010), *cert. denied*, 131 S. Ct. 186 (2010). Similarly, "[w]e review the district court's grant of summary judgment *de novo*, applying the same legal standards as

---

[1] LanLogistics dissolved in Delaware on December 27, 2007. By January 16, 2008, the Florida Secretary of State processed and filed documents withdrawing LanLogistics's authority to transact business in Florida. Holston filed this lawsuit on June 6, 2008—more than four months after LanLogistics lost its ability to conduct business in Florida.

the district court." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1242-43 (11th Cir. 2003) (citation omitted). "Summary judgment is appropriate if the evidence establishes 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Id.* at 1243 (citing Fed. R. Civ. P. 56(c)).

## III.

Federal courts have subject-matter jurisdiction over civil actions in which: (1) "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs"; and (2) the action is between "citizens of different States." 28 U.S.C. § 1332(a)(1). Congress extends the benefits and safeguard of federal courts to "provide a separate forum for out-of-state citizens against the prejudices of local courts and local juries." S. REP. NO. 1830, at 3 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3099, 3101–02.

Diversity jurisdiction is determined at the time the complaint was filed. *See Smith v. Sperling*, 354 U.S. 91, 93 n.1 (1957) ("[J]urisdiction, once attached, is not impaired by a party's later change of domicile."). To meet the jurisdictional requirements of § 1332(a), the citizenship of each plaintiff must be different from that of each defendant. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978). "[A] corporation shall be deemed to be a citizen of every State and foreign

4

state by which it has been incorporated and of the State or foreign state where it has its principal place of business . . . ." 28 U.S.C. § 1332(c)(1). The issue here is whether a dissolved or inactive corporation has a principal place of business. The Eleventh Circuit has not decided this issue, and the circuits that have disagree.

The Second Circuit has held that, for purposes of analysis under § 1332, a corporation's principal place of business must be identified regardless of whether the corporation is defunct. *W. M. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 141 (2d Cir. 1991). The rule recognizes that when a corporation closes its doors and winds up its business, it might still have a local presence that would alleviate concerns about local bias. Finding citizenship in the state where a corporation last conducted business ensures federal jurisdiction will not be extended to corporations to which Congress had no intention of providing the benefit. *Id.*

The Third Circuit has also adopted a bright-line rule, but it rejects the idea that a court should strain to identify a principal place of business when one may not exist. In the Third Circuit, a dissolved or inactive corporation is a citizen only of the state in which it was incorporated. *Midlantic Nat'l Bank v. Hansen*, 48 F.3d 693, 696 (3d Cir. 1995).

The Fourth and Fifth Circuits prefer the flexibility of a facts and

circumstances test. *Harris v. Black Clawson Co.*, 961 F.2d 547, 551 (5th Cir. 1992); *see also Athena Auto., Inc. v. DiGregorio*, 166 F.3d 288, 291 (4th Cir. 1999). In those circuits, the extent of a corporation's local character drives the determination as to whether a principal place of business exists for purposes of federal jurisdiction. There, a corporation's last place of business is instructive but not dispositive. "[W]here a corporation has been inactive in a state for a substantial period of time . . . that state is not the corporation's principal place of business . . . ." *Harris*, 961 F.2d at 551 (footnotes omitted).

A recent decision by the Supreme Court is also relevant to this determination. In *Hertz Corp. v. Friend*, the Supreme Court held that simple jurisdictional tests are preferable even if application of the rule occasionally cuts against the basic rationale of § 1332. 130 S. Ct. 1181, 1193–94 (2010).

> Complex jurisdictional tests complicate a case, eating up time and money as the parties litigate, not the merits of their claims, but which court is the right court to decide those claims. Complex tests produce appeals and reversals, encourage gamesmanship, and, again, diminish the likelihood that results and settlements will reflect a claim's legal and factual merits.

*Id.* at 1193 (citations omitted). The Court also reasoned that, because courts have an independent obligation to determine whether subject-matter jurisdiction exists, courts require "straightforward rules under which they can readily assure themselves of their power to hear a case." *Id.* Accordingly, the Court announced

6

a simple rule wherein a corporation's principal place of business is determined based on where the corporation's "nerve center" is located.

Considering the jurisdictional tests in the various circuits and the guidance of the Supreme Court in *Hertz*, we join the Third Circuit in holding a dissolved corporation has no principal place of business. This bright-line rule may open federal courts to an occasional corporation with a lingering local presence, but undeserved access to a fair forum is a small price to pay for the clarity and predictability that a bright-line rule provides. Moreover, in our opinion, the Third Circuit rule aligns most closely with the Supreme Court's analysis in *Hertz*. By contrast, for example, the Second Circuit's rule focuses not on a corporation's nerve center but where business was last conducted. Conceivably, under that rule a corporation could be considered a citizen of a state in which it was not a citizen before dissolution.

Here, LanLogistics dissolved and formally withdrew from business before Holston filed suit. Under the rule we adopt today, LanLogistics is therefore only a citizen of Delaware, and this court has subject-matter jurisdiction.

## IV.

In a supplemental summary judgment order the district court held as a matter of law that the purchase price of LanBox was $450,000. In its analysis, the

district court rejected LanLogistics's argument that, under the reasoning in *Pantry Pride Enterprises., Inc. v. Stop & Shop Cos., Inc.*, 806 F.2d 1227, 1231 (4th Cir. 1986), the determination of the purchase price of a company in a package purchase requires that the fair market value of the company be considered. We find the reasoning in *Pantry Pride* persuasive and the district court's holding in error.

In *Pantry Pride*, the Fourth Circuit rejected the price allocated to a lease in a package purchase because the listed price represented neither the market value nor the actual value the parties placed on the lease. *Id.* In that case, a lessor had a right of first refusal option on a lease of a supermarket. *Id.* at 1228. The lessor sued when the lessee offered to sell the lease and various equipment as part of a package deal to a third party but refused to sell the lessor the lease at the price allocated in the package deal. *Id.* The court held that the lessor could exercise its right of first refusal but not at the artificially low price allocated to the lease in the package agreement. It found that the low price was allocated to the lease for tax purposes, and the lessor would enjoy a windfall if allowed to purchase the lease at the artificial price. *Id.* at 1231. The lessor was only entitled to purchase the lease at a fair price offered by a third party, but the artificial price allocated to the lease bore little relation to its worth. *Id.*

Requiring as a matter of law that the price allocated in a package purchase

be used as the price for these types of claims may also discourage commerce or allow parties to destroy contractual rights. If first refusal rights could be exercised only at the price allocated in a contract, then buyers would be forced to allocate high prices to assets that are subject to rights of first refusal. *Id.* The inability to manipulate purchase prices for tax purposes ultimately may act as a restraint on alienation. *Id.* "The tax consequences of the transaction for the parties to a sale should not vary because some third party may possess a first refusal right." *Id.* Additionally, by inflating the price assigned to the subject of a first-refusal option, parties could defeat a contractual right of first refusal. *Id.* at 1231-32. While parties should be allowed to allocate prices for tax purposes, in a package deal, manipulated price allocations should not be determinative as to agreements between those who extend or hold first-refusal options.

Because the issue of LanBox's purchase price was disputed and the fair market value of LanBox and the other companies in the package deal should have been considered, summary judgment was improper. By deciding the issue on summary judgment before LanLogistics had an opportunity to present evidence on the fair market value of the companies or possible tax incentives for its purchase price allocation, the district court prematurely decided a disputed issue of material fact. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1264 (11th Cir. 2007)

9

(finding that it was error for the district court to grant summary judgment when there were genuine issues of material fact).  Therefore, the district court's supplemental summary judgment order is reversed and remanded.  On remand, a determination should be made regarding the fair market value of each company in the package deal to identify the percentage of the $3.5 million purchase price used to purchase LanBox.

The district court is AFFIRMED in part and REVERSED in part.  The case is remanded for determination of the purchase price and calculation of damages.

**AFFIRMED IN PART AND REVERSED IN PART.**