[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11808
_____

D.C. Docket No. 0:16-cv-61474-BB

ANDREA BELLITTO,

Plaintiff,

AMERICAN CIVIL RIGHTS UNION,

Plaintiff - Appellant,

versus

BRENDA SNIPES,
in her official capacity as the Supervisor of Elections of Broward County, Florida,

Defendant - Appellee,

1199SEIU UNITED HEALTHCARE WORKERS EAST,

Intervenor Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 22, 2019)

Before MARCUS, GRANT and HULL, Circuit Judges.

MARCUS, Circuit Judge:

The National Voter Registration Act requires state election officials to make a reasonable effort to remove certain ineligible registrants from the voter rolls. The American Civil Rights Union ("ACRU") claims that Brenda Snipes, the former Broward County Supervisor of Elections, failed to satisfy her list-maintenance obligations. The district court, after a bench trial, concluded that the National Voter Registration Act ("NVRA") requires a reasonable effort to remove only those voters who become ineligible because of death or change of address and that Snipes reasonably conducted a program to do just that. ACRU appeals from those determinations.

This appeal requires us to answer three related legal questions. First, is the NVRA's list-maintenance mandate confined to removing voters who become ineligible because they moved or died, or does the mandate extend to other bases of ineligibility as well, such as mental incapacity or criminal conviction? Second, does anything in the Help America Vote Act ("HAVA") broaden the NVRA's list-maintenance obligations? And finally, does the National Change of Address procedure outlined in the NVRA create a safe harbor for reasonable list maintenance regarding voters who have moved? As for the first question, the statute could not be clearer: the states and their subsidiaries are required to conduct

2

a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible on account of death or change of residence, and only on those two accounts. And nothing found in HAVA -- the latest congressional codification addressing voter registration -- changes what is required by the NVRA; indeed, HAVA repeatedly references compliance with the NVRA's list-maintenance mandates. Finally, the NVRA sets forth an explicit safe-harbor procedure by which the states may fulfill their list-maintenance obligations as to voters who move.

Moreover, after thoroughly reviewing this record and having taken oral argument, we can discern no clear error in the district court's factual findings. As the trial court found, Snipes employed the statute's safe-harbor provision when she examined who may have changed his or her address in Broward County, and she also utilized reliable death records from the Florida Department of Health and the Social Security administration to identify and regularly remove deceased voters. The NVRA requires a reasonable effort to remove only those voters who become ineligible because of death or change of address. Based on the record developed in the five-day bench trial, the district court did not clearly err in finding that Broward's Election Supervisor conducted a program reasonably designed to accomplish these tasks. Accordingly, we affirm the judgment of the district court.

3

I.

The essential facts adduced at trial and the procedural history are these. American Civil Rights Union, Inc. ("ACRU") is a nonprofit corporation that works on election-integrity issues. From November 1, 2003, through the adjudication of this suit in district court and until the end of 2018, Brenda Snipes ("Snipes") was the Supervisor of Elections for Broward County, Florida, and oversaw the Broward County Supervisor of Elections Office ("BCSEO"). Although the NVRA centralizes coordinating responsibility in the state and a state-designated chief elections officer -- in Florida, the Secretary of State -- Florida law delegates primary authority for voter registration list maintenance to the county-level supervisors of elections. See 52 U.S.C. § 20509 ("Each State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this chapter."); Fla. Stat. § 98.015 (mandating that "[t]he supervisor of elections . . . shall update voter registration information, enter new voter registrations into the statewide voter registration system, and act as the official custodian of documents received by the supervisor related to the registration of electors and changes in voter registration status of electors of the supervisor's county" and requiring that "[e]ach supervisor shall ensure that all voter registration and list maintenance procedures conducted by

4

such supervisor are in compliance with any applicable requirements . . . prescribed by . . . the National Voter Registration Act of 1993").[1]

On January 26, 2016, Susan Carleson, the President of ACRU, sent Snipes a statutory notice letter pursuant to 52 U.S.C. § 20510(b), which affords the state an opportunity to correct any violation prior to the commencement of a private action under the National Voter Registration Act, Pub. L. No. 103-31, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501-20511 (2012)).  The letter claimed that Broward County was "in apparent violation" of Section 8 of the NVRA, which requires the states regularly to conduct maintenance on its voter registration lists, removing certain ineligible voters.  ACRU explained that it had compared registration totals to population data and concluded that Broward County had an "implausible" registration rate, yielding the strong inference that the County had inadequately maintained its voting lists.  Snipes responded that Florida maintains a statewide voter registration database and that the state issues statewide guidelines and procedures for list maintenance, and referred ACRU to sections 98.045 and 98.065 of the Florida Statutes.  Snipes asserted that contrary to ACRU's suggestion, Broward's registration rate had never exceeded 100% of residents

---

[1] The plaintiffs have not challenged the State's delegation of NVRA duties to the county-level supervisor of elections under Florida Statute § 90.015.

5

during her tenure, and attached list-maintenance compliance certifications filed biannually with the Florida Department of State.

On June 27, 2016, ACRU sued Broward County Supervisor Snipes in the United States District Court for the Southern District of Florida.[2]  Count I of the Amended Complaint alleged that Snipes "failed to make reasonable efforts to conduct voter list maintenance programs, in violation of Section 8 of NVRA, 52 U.S.C. § 20507 and 52 U.S.C. § 21083(a)(2)(A) [a provision of the Help America Vote Act]."  And Count II claimed that Snipes had "failed to respond adequately to Plaintiffs' written request for data, failed to produce or otherwise failed to make records available to Plaintiffs concerning Defendant's implementation of programs and activities for ensuring the accuracy and currency of official lists of eligible voters for Broward County, in violation of Section 8 of the NVRA, 52 U.S.C. § 20507(i)."  On September 19, 2016, 1199SEIU United Healthcare Workers East ("1199SEIU"), a labor union, moved to intervene in the lawsuit pursuant to Rule 24 of the Federal Rules of Civil Procedure "to protect the interests of itself and its members and ensure that no voter, including its members, in Broward County has his or her registration improperly or illegally canceled as a result of the Plaintiffs'

---

[2] The suit was filed in the name of the ACRU and one of its members, Andrea Bellitto, but Bellitto was dismissed for lack of standing because she did not provide the County with the requisite statutory notice.  Bellitto has not appealed from that judgment.

request for court-ordered voter 'list maintenance.'" The district court granted the motion to intervene.

After completion of discovery, the parties cross-moved for summary judgment on Count II. The district court initially denied those motions, but later dismissed Count II sua sponte. The court concluded that it was without jurisdiction to adjudicate that claim because the American Civil Rights Union had failed to provide adequate statutory notice pursuant to § 20510(b). ACRU has not appealed from the entry of final summary judgment on Count II. The district court denied summary judgment on Count I, concluding that whether Snipes actually conducted an adequate general program of list maintenance to remove voters who had moved or died was a fact-intensive question, more appropriately resolved after a full airing at trial, particularly in light of ACRU's evidence of "very high voter registration rates" in Broward County.

The district court conducted a bench trial, taking extensive testimony about registration rates, list-maintenance tools employed by the BCSEO, other tools that might be used to identify ineligible voters, and citizen complaints made to the BCSEO. Most relevant for our purposes, dueling experts testified in considerable detail regarding the registration rates in Broward County. ACRU called Scott Gessler, the former Colorado Secretary of State, to testify about voter list maintenance tools and offer his expert opinion about what constitutes a reasonable

7

effort.  BCSEO employees -- Director of Voter Services Mary Hall, IT Director Jorge Nunez, and Voter Services Coordinator Sharon Fleming -- as well as Snipes herself, in turn, testified about the procedures the County employs.  The district court also reviewed thousands of pages of documentary evidence, including spreadsheets documenting voter removals and certifications of list maintenance that Snipes regularly filed with Florida's Department of State.

On March 30, 2018, the trial court issued a lengthy opinion, making extensive findings of fact and conclusions of law, and entered final judgment in favor of Snipes.  The district court concluded, as a legal matter, that the NVRA requires the state or the County to create a program of list maintenance that makes a reasonable effort to remove voters who become ineligible only by reason of death or change of address, and that, as a matter of fact, the evidence established that Snipes had made an adequate effort to do so, availing herself of the NVRA's change-of-address safe harbor and relying on state and Social Security administration death records in order to identify and remove deceased voters.

ACRU has appealed from both determinations.

## II.

## A.

"We review an issue of statutory interpretation de novo."  Scimone v. Carnival Corp., 720 F.3d 876, 880 (11th Cir. 2013) (citing United States v.

8

Murrell, 368 F.3d 1283, 1285 (11th Cir. 2004)).  But we review for clear error

factual findings made by a district court after a bench trial.  Holton v. City of

Thomasville Sch. Dist., 425 F.3d 1325, 1350 (11th Cir. 2005); Fed. R. Civ. P.

52(a).  "Clear error is a highly deferential standard of review."  Holton, 425 F.3d at

1350.  A factual finding is clearly erroneous "when although there is evidence to

support it, the reviewing court on the entire evidence is left with the definite and

firm conviction that a mistake has been committed."  Id. (quoting Anderson v. City

of Bessemer City, 470 U.S. 564, 573 (1985)). In Anderson, the Supreme Court

explained that the clear error standard

> plainly does not entitle a reviewing court to reverse the finding of the
> trier of fact simply because it is convinced that it would have decided
> the case differently.  The reviewing court oversteps the bounds of its
> duty under Rule 52(a) if it undertakes to duplicate the role of the
> lower court.  In applying the clearly erroneous standard to the findings
> of a district court sitting without a jury, appellate courts must
> constantly have in mind that their function is not to decide factual
> issues de novo.  If the district court's account of the evidence is
> plausible in light of the record viewed in its entirety, the court of
> appeals may not reverse it even though convinced that had it been
> sitting as the trier of fact, it would have weighed the evidence
> differently.  Where there are two permissible views of the evidence,
> the factfinder's choice between them cannot be clearly erroneous.

Anderson, 470 U.S. at 573–74 (citation and quotation marks omitted).  Finally, we

review "[a] court's application of law to facts" de novo.  Holston Invs., Inc. v.

LanLogistics, Corp., 677 F.3d 1068, 1070 (11th Cir. 2012).

9

B.

The United States Constitution vests in the states the authority to regulate federal elections but reserves to Congress the prerogative to alter a state's procedures.  U.S. Const. art. I § 4 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators.").  Three decades after passing the Voting Rights Act of 1965, and against the backdrop of waning election participation, Congress exercised its authority and adopted the National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501-20511 (2012)).

The Act made three explicit findings: "(1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities."  52 U.S.C. § 20501(a).  In light of these findings, the statute elaborated as one set of goals "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "to make it possible for Federal, State,

10

and local governments to implement [the Act] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C.§ 20501(b)(1)-(2). But because Congress also recognized that easing registration barriers could threaten the integrity of our elections, the legislation set forth another set of goals: "to protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." Id. § 20501(b)(3)–(4).

These twin objectives -- easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls -- naturally create some tension. Undoubtedly, a maximum effort at purging voter lists could minimize the number of ineligible voters, but those same efforts might also remove eligible voters. Conversely, preventing the states from removing registrants altogether would ensure that no eligible voters are removed, but, at the same time, maximize the risks associated with inaccurate voter rolls. Thus, Congress crafted a statute that sought to balance these competing interests.

At the heart of this case is the meaning of Section 8(a) of the NVRA, which reads this way:

> In the administration of voter registration for elections for Federal office, each State shall--
>
> . . .

11

(3) provide that the name of a registrant may not be removed from the official list of eligible voters except--

(A) at the request of the registrant;
(B) as provided by State law, by reason of criminal conviction or mental incapacity; or
(C) as provided under paragraph (4);

(4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of--

(A) the death of the registrant; or
(B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

Id. § 20507(a)(3)–(4).  In short, the law permits the states to remove registrants

only under defined circumstances -- at the request of the voter, by reason of

criminal conviction or mental incapacity as provided in state law, or because of

death or change of residence; but it also requires the states to conduct a general

program that makes a reasonable effort to remove the names of voters who have

become ineligible on account of death or change of address.

Congress made these and the other provisions of the NVRA enforceable by

expressly creating a private cause of action.  Thus, under the Act:

(1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil

action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

Id. § 20510(b).

In the wake of the 2000 presidential election, Congress again took up the administration of the electoral process by adopting the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666 (codified as amended at 52 U.S.C. §§ 20901–21145 (2012)).  This time, Congress mandated that the states create computerized statewide voter registration lists.  52 U.S.C. § 21083.  It also required that the states conduct maintenance of the statewide voter registration list by utilizing "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters."  Id. § 21083(a)(4)(A).  The statute provides, however, that "if an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993."  Id. § 21083(a)(2)(A)(i).  Notably, and unlike the National Voter Registration Act, HAVA creates no private cause of action; rather, its provisions are enforceable only through actions taken by the Attorney General of the United States or by filing an administrative complaint with the state.  Id. §§ 21111, 21112.

13

C.

Our first and most basic question then is a legal one: whether the National Voter Registration Act requires Supervisor Snipes to conduct a general program of list maintenance that makes a reasonable effort to remove voters from the rolls who became ineligible only on account of death or change of address, as the district court concluded, or whether the statute also requires the creation of a general program of list maintenance aimed at other bases of ineligibility as well, such as by reason of criminal conviction or mental incapacity, as ACRU contends.

We begin "where all such inquiries must begin: with the language of the statute itself." United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989). We "presume that [the] legislature says in a statute what it means and means in a statute what it says there." BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004) (quoting Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253–54 (1992)). "Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." Id. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997).

In this case, the text unambiguously mandates that the states maintain a "general program that makes a reasonable effort to remove the names of ineligible

14

voters from the official lists of eligible voters by reason of" only two things: death or change of address.  52 U.S.C. § 20507(a)(4).  Context confirms this plain reading.  Subsection (a)(3) sets forth a prohibition and limited permissive exceptions: a registrant may not be removed from the official list of eligible voters except (1) at the registrant's request, (2) as provided by State law, by reason of criminal conviction or mental incapacity, or (3) as set forth in subsection (a)(4).  That is, states may remove a registrant from the voter rolls, but only under those three circumstances.  Subsection (a)(4), in turn, creates an affirmative obligation: the states shall conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of (1) the death of the registrant, or (2) a change in the residence of the registrant.

The statutory structure further reveals that Congress intended to treat the categories of ineligibility differently.  The states may remove some registrants for some reasons, but shall remove some for other reasons.  Indeed, "when Congress uses different language in similar sections, it intends different meanings." DIRECTV, Inc. v. Brown, 371 F.3d 814, 818 (11th Cir. 2004) (quoting Iraola & CIA, S.A. v. Kimberly-Clark Corp., 232 F.3d 854, 859 (11th Cir. 2000)).  On the one hand, Congress made removal based on the request of the registrant, criminal conviction or mental incapacity permissive, while on the other, it required an affirmative program of list maintenance to remove voters who become ineligible

15

because of death or change of address.  The statute is structured to treat these ineligibility categories differently.

What ACRU really has asked us to do is to rewrite the statute so as to treat all of the categories of ineligibility in the same way.  It would have us read the statute as imposing on the states a general program of list maintenance that makes a reasonable effort to remove <u>any</u> ineligible voter, regardless of the basis of ineligibility.  But we may not rewrite the unambiguous text, where Congress has been crystal clear in treating different categories of ineligibility in different ways. The only one of our sister circuits to address this question has read the statute's text in the same way.  <u>See</u> <u>Am. Civil Rights Union v. Philadelphia City Comm'rs</u>, 872 F.3d 175, 184 (3d Cir. 2017) ("Nothing in [ACRU's] game of statutory Twister plausibly suggests that the plainly mandatory language in (a)(4) should be substituted for the plainly permissive language of (a)(3).").

Since the statutory language is plain and unambiguous and requires the states to employ a general program of list maintenance that makes a reasonable effort to remove voters based only on account of death or change of address, we have no occasion to examine statutory purpose.  But to the extent ACRU claims that Congress intended to create a mandatory general obligation on the states to remove voters from the rolls for many reasons, our reading of the text does not conflict with the statute's stated purposes.  As we have already explained, the

16

NVRA sought to balance competing objectives.  ACRU points to just one of the statute's broadly stated purposes -- "to ensure that accurate and current voter registration rolls are maintained," 52 U.S.C. § 21501(b)(4) -- in order to sustain its argument that Section 8 means more than it says.  But "purpose . . . cannot be used to contradict text or to supplement it."  ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 57 (2012).  "Purpose sheds light only on deciding which of various textually permissible meanings should be adopted."  Id.  And the NVRA is particularly ill-suited to focus on purpose rather than text because the statute's purposes are multiple and in some tension with each other: Congress sought to increase voter registration and to limit purging efforts that could impede the exercise of the franchise, while at the same time ensuring that voter rolls remain accurate and current.  The NVRA, with its carefully balanced objectives, is paradigmatic of legislation aimed at maximizing competing social values.  To take but one example, the House report on the legislation noted that the Committee on House Administration's Subcommittee on Elections had considered mandating same-day voter registration, which would have substantially increased the number of eligible voters registered, but ultimately rejected the idea because of many perceived administrative problems, including the "procedures for verification." H.R. Rep. 103-9, at 4 (1993).

17

ACRU advances several additional arguments, however, in the face of this unambiguous text. We remain unpersuaded. First, it claims that the NVRA's references to "eligible voters," "registrants," and "systematically remov[ing] the names of ineligible voters" suggest that the Act contemplated a list-maintenance program sweeping far beyond the removal of voters because of death or change of address; and, second, that the NVRA must be read together with HAVA, which, it says, "clarifies" that the general program requiring list maintenance necessarily covers all ineligibility factors.

Thus, ACRU argues that subsection 8(a)(1) of the NVRA references "eligible" voters, and "limit[s] the voter list to 'eligible' voters." Subsection 8(a)(1) mandates that states "ensure that any eligible applicant is registered to vote in an election" by making registration easier in a number of ways. 52 U.S.C. § 20507(a)(1). This provision affirmatively requires states to register eligible voters. The use of the word "eligible" here limits the affirmative obligation. Of course Congress would not have mandated that the states register any applicant -- if an applicant is not eligible to vote, a state would be under no obligation to register the applicant. The problem with ACRU's argument is that this provision says nothing about list maintenance and there is no authority for the proposition that its reference to "eligible" voters should be read into a separate, and separately clear, provision.

18

ACRU also points to subsection 8(c)(2), which provides that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). It asks us to read this provision as somehow creating a requirement that the states systematically remove the names of all ineligible voters and do so at least 90 days before an election. Again, we are unpersuaded. For starters, the provision is more naturally read as a prohibition on the states' engaging in any systematic voter registration list purging in the months leading up to an election. The statute says that the states must complete "<u>any program the purpose of which</u>" is purging at least 90 days out; it does not say that states must complete "<u>a</u> program" to purge the rolls. Moreover, if the provision meant what ACRU suggests -- that the states are under an affirmative obligation to systematically remove the names of all ineligible voters -- then subsection 8(a)(4)'s requirement that the states make a reasonable effort at removing registrants who have become ineligible by reason of death or change of address would be utterly superfluous. Between competing interpretations, one which renders part of the statute superfluous and one which gives effect to all of its provisions, we opt for the latter. <u>Microsoft Corp. v. I4I Ltd. Partnership</u>, 564 U.S. 91, 106 (2011).

ACRU also claims that the Help America Vote Act must be read to have clarified or modified the National Voter Registration Act's requirements.  It cites HAVA's mandate that the states maintain a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters."  ACRU again claims that this provision "mak[es] explicit what was already at least implicit in NVRA's section 8(c)(2) requirement that a state 'shall complete [90 days before federal elections] any program . . . to systematically remove the names of ineligible voters from the official lists of eligible voters.'"  ACRU's reference back to subsection 8(c)(2) suffers from the same problems we have identified.  To read that provision as having required a systematic purging effort twists the statute implausibly.  Moreover, HAVA's reference to "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" is followed by explicit reference to the NVRA's notice-and-failure-to-vote procedures.  Congress knew how to reference the NVRA and certainly knew how to amend it if it chose to do so.  Indeed, HAVA explicitly mandates that "[i]f an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993 . . . including subsection[] (a)(4) . . . of section 8."  52 U.S.C. §

21083(a)(2)(A)(i).  Nothing in HAVA broadens the scope of the NVRA's list-maintenance obligations.

Moreover, even if HAVA could somehow be read to require the states to maintain a purge process that went far beyond what the NVRA requires -- a reading that is at war with the text -- HAVA creates no private cause of action. Congress established only two HAVA enforcement mechanisms: (1) a civil action brought by the Attorney General, and (2) a state-based administrative complaint procedure. 52 U.S.C. §§ 21111, 21112.  "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." Alexander v. Sandoval, 532 U.S. 275, 286 (2001).  Where Congress has not created a private right of action, courts may not do so, "no matter how desirable that might be as a policy matter, or how compatible with the statute."  Id. at 287. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  Id.  ACRU does not -- and indeed could not reasonably -- argue that Congress intended to create a private right of action in HAVA.

What we are left with is the unambiguous language found in the NVRA.  It requires the states to conduct a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible because of a change of address or death.  Although the statute also allows and encourages the states to

21

conduct additional programs of list maintenance -- and indeed the states have administrative and other incentives to do so -- the statute requires nothing more of the state.  We cannot rewrite the statute to impose additional obligations on the states when Congress chose not to.

D.

The National Voter Registration Act also provides the states with a safe harbor for conducting a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible because of a change of address.  In general, a safe harbor is a statutory provision "that affords protection from liability or penalty."  Safe Harbor, BLACK'S LAW DICTIONARY (11th ed. 2019).  Under section 8(c)(1):

> (1) A State may meet the requirement of subsection (a)(4) by establishing a program under which--
>
> > (A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and
> >
> > (B) if it appears from information provided by the Postal Service that--
> >
> > > (i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the

22

> registrant may verify or correct the address information; or
>
> (ii) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

52 U.S.C. § 20507(c)(1) (emphasis added).  Subsection 8(d) further provides:

> (1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant--
>
> (A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
>
> (B)(i) has failed to respond to a notice described in paragraph (2); and
>
> (ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.
>
> (2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:
>
> (A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period

23

beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

(B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

(3) A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

Id. § 20507(d).

Because the information provided by the Postal Service is collected in the National Change of Address database, this process is known as the NCOA Process. The statutory text is clear -- a state "may meet the requirement" of a general program of list maintenance for change of address by following the NCOA Process outlined in § 20507(c) to identify and remove ineligible voters.  Therefore, sections 8(a)(4) and (d)(3) of the NVRA establish that an election official in order to comply with the NVRA and take advantage of the safe-harbor provision must not only identify potentially ineligible registrants using the NCOA database and mailing procedures, but must also actually remove those ineligible registrants from the rolls.  See A. Philip Randolph Inst. v. Husted, 838 F.3d 699, 703 n.2 (6th Cir. 2016), rev'd on other grounds, 138 S. Ct. 1833 (2018) ("Because that subsection describes the NCOA Process as one way in which states 'may' comply with their

24

obligation under the NVRA to identify and remove voters who are no longer eligible due to a change of residence, the NCOA Process is sometimes referred to in this litigation as the 'Safe–Harbor Process.'") (citation omitted).

Despite the statutory text affording the states a clearly delineated procedure to comply with its statutory obligations concerning change of address, ACRU argues that while states may employ this method, it still may not meet the statutory requirements. We disagree. ACRU argues that in Husted "the Supreme Court treated [the provision] . . . as but one permissible trigger that may be used to start a return card removal procedure." In Husted, the Court considered the lawfulness of Ohio's Supplemental Procedure that involved more than the NCOA data to identify ineligible voters. Husted v. A. Philip Randolph Inst., 138 S. Ct. 1833 (2018). Whether a state could permissibly go beyond the safe harbor provision in its efforts to identify ineligible voters is a markedly different question from the minimum statutory requirement question we answer today. It is true that the Supreme Court referenced the NCOA Process as "one option" for a procedure to employ before removing a voter from the rolls. Id. at 1839. But the Court never suggested that the NCOA Process standing alone would not satisfy (a)(4), only that states may go beyond it. And its comment, which ACRU cites, that "according to the Postal Service '[a]s many as 40 percent of people who move do not inform the Postal

25

Service,'" was made in that context to explain why Ohio might wish to employ more robust procedures.  Id. at 1840.

Congress could have required more, and perhaps other procedures would be even more effective at identifying change-of-address ineligibility.  Indeed, under the NVRA and Husted, the states are permitted to employ more robust procedures. But the fact that states may employ other procedures does not mean the clear language creating a safe harbor mechanism by which a state may "meet the requirement" of subsection (a)(4) is something other than what it plainly says -- a method to satisfy the statute.

While the statute requires a general program of list maintenance that makes a "reasonable effort" to remove voters who become ineligible because of change of residence or death, it does not define what a "reasonable effort" entails.  As a safe harbor, the NCOA Process, at a minimum, constitutes a reasonable effort at identifying voters who have changed their addresses.  Because we can find no clear error in the district court's factual determination that Snipes employed the NCOA Process and availed herself of the safe harbor, we need not address what other procedures might constitute a reasonable effort concerning a voter's change of address.  As for voters who become ineligible because of death, we agree with the district court that a jurisdiction's reliance on reliable death records, such as state health department records and the Social Security Death Index, to identify and

26

remove deceased voters constitutes a reasonable effort.  The state is not required to exhaust all available methods for identifying deceased voters; it need only use reasonably reliable information to identify and remove such voters.

III.

After thoroughly reviewing this record, we can discern no clear error in the district court's finding that Supervisor Snipes made reasonable efforts to remove registrants from the voter rolls on account of death or relocation.

A.

Based on the testimony of Jorge Nunez, Snipes's IT Director, as well as invoices and other documentary evidence, the district court explained the County's use of the safe-harbor process this way.  Generally, the Broward County Supervisor of Elections Office contracts with a third-party vendor, Commercial Printers, a certified NCOA-Link USPS provider, who has been BCSEO's vendor for many years.  In every odd-numbered year, Snipes's office works with Commercial Printers to identify those voters who may have become ineligible on account of having moved.  Once they have identified voters who have potentially moved using Commercial Printers' NCOA data, Broward County sends, through Commercial Printers, a series of mailings to confirm a registrant's ineligibility before removing the registrant from the voter rolls.  Among these mailings are the initial address confirmation mailing, which seeks to confirm that a voter still lives

27

at an eligible address.  If that mailing is returned to the County as undeliverable, BCSEO prepares additional mailings in an effort to confirm, usually making three attempts, including a "final notice" which must be answered within 30 days, before the voter is moved from "active" to "inactive" status on the rolls.  Once a voter has fallen into the "inactive" status, the voter is removed from the rolls if she fails to vote in two consecutive general elections.

Having examined at length the process utilized by the County, the district court found that between January 1, 2014, and December 31, 2016, the County removed 85,484 registrants who moved out of Broward County; 2,739 additional registrants who moved out of the county and requested a change of address; 1,886 additional voters who asked to be removed from the voting rolls; and 97,941 voters whose mail was returned as undelivered and who remained inactive for two general elections.

Based on the evidence adduced at trial, we discern no clear error in the trial court's finding that Snipes used the safe-harbor process created by the NVRA. Indeed, ACRU does not claim that the district court committed clear error in this determination, hanging its hat instead on the wholly implausible theory that the NCOA Process is not a safe harbor at all.  Because we have concluded that the National Change of Address Process is a safe harbor in the National Voter Registration Act scheme for voter list maintenance, and because the district court's

28

factual finding that Snipes reasonably used this process was not clearly in error, we affirm its conclusion that the County Supervisor met her statutory obligations regarding purging from the voting lists voters who have changed their residences.

## B.

We also see no clear error in the district court's finding that Snipes made a reasonable effort at removing deceased voters -- the second mandatory obligation placed on the states by the NVRA.  As a matter of general practice, Florida's Department of State obtains reports of deceased individuals from both the Florida Health Department and the Social Security Death Index ("SSDI") and regularly forwards that information to Broward County.  BCSEO then enters that information into the Voter Registration System, and if there is a match with the date of birth, the address, and the last four digits of the voter's Social Security number, it will remove the deceased voter from the rolls.  The district court determined that these removals occurred on a "daily basis."  If an irregularity in the information is found, BCSEO practice is to request the death certificate from the voter's family.  If the County receives information that a voter is deceased from sources other than Florida's Department of State, it attempts to obtain a death certificate before removing the voter from the rolls.  If, however, the County is unable to acquire a death certificate, it will attempt to confirm the death of the registrant with the State.  Finally, if the County is still unable to confirm a death, it

will send a death notice to the registrant's last-known address for confirmation before removing the voter from the rolls. The district court found that between January 1, 2014 and December 31, 2016, Snipes removed some 37,095 registrants from Broward County's voter rolls who had died.

Moreover, there is a remarkable consistency in the number of deceased voters who were removed from the rolls during each of the six-month periods reflected in Snipes's certifications filed with the Department of State. The certifications covered fourteen distinct six-month periods. The first certification is for the period January 1 to June 30, 2009. The certifications cover every six-month period thereafter until the end of 2016, except for the one-year period from July 1, 2009 to June 30, 2010. Eight of the fourteen certifications showed that between 5,000 and 7,000 deceased voters were removed each time from the rolls. Four established that between 3,400 and 4,900 deceased voters were removed, while one certification said that 7,759 were removed and one established that 9,924 were removed. The evidential foundation was sufficient to allow the district court to fairly determine that the certifications reflected an ongoing and regular list-maintenance process for removing deceased voters. And it is undisputed that Snipes employed reasonably reliable information to identify and remove these voters.

30

ACRU argues, nevertheless, that it was unreasonable for the County not to use additional available tools in order to identify deceased voters, such as the Social Security Cumulative Death Index -- which, unlike the periodic SSDI, contains a list of everyone who has passed away since the database was created -- and the State Territorial Exchange of Vital Events ("STEVE") -- which, like the SSDI and SSDI Cumulative, is yet another database shared between states that could have captured out-of-state deaths.  It is plausible that if the County had also used the SSDI Cumulative or STEVE, it could have captured additional deceased voters.  But the NVRA only requires that Broward County make a reasonable effort, not an exhaustive one, and the Florida Health Department's records and the SSDI are reliable sources of information concerning registrant deaths.  Indeed, ACRU has failed to establish that these sources would not effectively capture most deceased voters.  The failure to use duplicative tools or to exhaust every conceivable mechanism does not make Snipes's effort unreasonable.

The long and short of it is that the trial court did not clearly err in finding that Snipes made a reasonable effort to identify and remove deceased voters.  She used reliable information that captured both in-state and out-of-state deaths -- the Florida Health Department and SSDI records -- and she removed deceased voters from the rolls on a regular and ongoing basis.

C.

One additional factual issue warrants further explanation.  ACRU presented some evidence purporting to establish registration rates that exceeded the number of eligible voters residing in Broward County.  As ACRU suggested, and as the district court recognized in denying summary judgment, implausibly high registration rates are troubling signs that may suggest the lack of a reasonable effort at voter list maintenance.  However, faced with dueling expert testimony about the validity of ACRU's figures, the district court did not clearly err in discounting this evidence.

Among other things, ACRU presented extensive expert testimony from Dr. Steven Camarota, a political scientist and elections expert who holds a Ph.D. from the University of Virginia.  Camarota calculated Broward County's registration rates for 2010, 2012, and 2014.  The registration rate is calculated by dividing the number of registered voters by the eligible voting population.  For the ratio's numerator -- the number of registrants -- Camarota used data drawn from the Election Administration and Voting Survey ("EAVS"), which compiles registration information that state jurisdictions provide to the U.S. Election Assistance Commission ("EAC") biennially.  Dr. Camarota calculated the ratios for 2010, 2012, and 2014, because those were the most recent EAVS years at the time he wrote his report in 2016.  For the denominator -- the eligible voter

32

population in Broward County -- Camarota used data drawn from the U.S. Census Bureau's American Community Survey ("ACS"). These calculations revealed registration rates consistently above 80% of the total 18-and-older population of Broward County, and when accounting for citizenship, the registration rates exceeded 100% in all three years when using the five-year ACS citizen population averages.

In sharp contrast, however, Snipes's expert, Professor Daniel Smith, who holds a Ph.D. in political science from the University of Wisconsin at Madison, and who has since 2003 been a professor of political science at the University of Florida, opined that Camarota's data and calculations were misleading. Smith testified that Camarota's numerator -- drawn from the EAVS data -- reflects the number of registrants as of the "book-closing date" in a given jurisdiction -- the last day someone can register to vote before an election.[3] Thus, this number is taken after all new registrations for an election and well into the 90-day period in which systematic list-maintenance efforts are prohibited by the NVRA in the lead up to an election. Smith explained that "October of an election year is almost by definition going to be a high point in a county's number of registered voters,

---

[3] On cross examination, 1199SEIU's counsel asked Camarota about when the EAVS data is collected, and though he appeared unfamiliar with the term "book closing," he did not dispute that the data was collected just before a federal election and that the registration numbers would have risen in that period. He also did not dispute that he could have obtained monthly data directly from the BCSEO.

compared to almost any other time in a two-year cycle because of the influx of newly registered voters and the limitation placed on supervisors in terms of taking voters off through normal list maintenance." He opined that the EAVS snapshot, therefore, could in no way be taken as a definitive picture of what a county's registration rate is, "much less any indication of whether list maintenance is going on and whether it's . . . reasonable."

Regarding Dr. Camarota's denominator -- drawn from the five-year ACS population data -- Smith also explained that the data employed significantly underestimated the population in two demonstrable ways. First, the five-year estimate takes data drawn from the preceding five years and estimates the midpoint of that data. The 2014 five-year estimate, therefore, estimates the population in the County at the middle of 2012. But in a jurisdiction with a substantially growing population, like Broward County, using the 2014 five-year estimate, therefore, would significantly underestimate the population for 2014, because it did not account for growth since 2012. Smith also testified that the ACS specifically asks who has resided in the household in the two-month period before the survey is taken, so by design it excludes many college students, military personnel, and persons who reside only part of the year in South Florida (primarily so-called "snowbirds," people who live in South Florida in the winter but elsewhere in the hot summer months) -- all of whom may be properly registered and vote in

34

Broward County but would not be included in the ACS population estimates. In short, Smith opined that Camarota used an artificially high numerator (the high point of registration at the book-closing date before a federal election) and an artificially low denominator (the five-year ACS estimate), resulting in an inflated registration rate.

The district court determined that Camarota's calculations were misleading. The court explicitly credited Snipes's data expert, and discounted the testimony of ACRU's expert, and concluded that the registration rates presented by ACRU were inaccurate. Thus, ACRU's argument that Broward County's registration rates were unreasonably high was neither dispositive nor uncontroverted and cannot salvage ACRU's claim that Snipes violated the NVRA's list-maintenance requirements.

As an appellate court, it is not our job -- indeed, we are not permitted -- to reweigh or examine the evidence anew. It is enough for us to observe that the trial court carefully considered the evidence and that its analysis of that evidence was not clearly erroneous. While it may be troubling that Snipes failed to produce any registration rate calculations of her own, Snipes did not shoulder the burden of persuasion and it was the prerogative of the district court to discount Camarota's opinion when faced with competing expert testimony that undermined his calculus and thus his credibility. In a bench trial, the district court judge is not just the

gatekeeper for the admissibility of expert testimony, but is itself the finder of fact, and we owe to it the same deference in assessing the credibility of expert testimony that we would owe to a jury. See Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc., 830 F.3d 1242, 1255 (11th Cir. 2016) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (quoting Holladay v. Allen, 555 F.3d 1346, 1354 (11th Cir. 2009)).

One other factual issue raised briefly in ACRU's Reply Brief and more thoroughly at oral argument warrants comment. ACRU suggested that the certifications entered into evidence demonstrate that Snipes failed to remove voters from the rolls for a two-year period -- from July 2013 to June 2015. ACRU argued that this too suggested a lack of list-maintenance activities during that time frame. Focusing on the 2013 to 2015 period, the original certifications show that no inactive voters were removed from the rolls from July 2013 through June 2015.

As we see it, the certification evidence does not establish clear error. For starters, the certification statistic that ACRU cites is much narrower than its argument implies. The statistic captures the "Number of inactive registered voters removed from the statewide voter registration system," which the certification form explains "are registered voters who were placed on the inactive list and who for two general election cycles thereafter did not vote or try, did not request an absentee ballot, nor updated their registration record." The category of "inactive

36

voters removed" is only a subset of the voters removed for reasons other than death, including change of address. Indeed, voters who are listed as "active" can be removed from the rolls for a variety of reasons, as Professor Smith testified. We add that ACRU did not question Snipes about the gap exposed in the certifications, and we cannot ourselves determine the reason for that gap. Nor can we decide that there was no reason for it.

Moreover, other evidence in the record paints a fuller picture of list maintenance, including the removal of voters from the rolls, ongoing during the 2013 to 2015 time period. First, the certifications themselves show a substantial number of voters moved from active to inactive during this time: 31,885 in the second half of 2013, and 59,905 in the first half of 2014. And as we've noted, the certifications also reflect thousands of deceased voters removed from the rolls in every six-month period. Moreover, Snipes produced spreadsheets of voter removals from the rolls from 2014 to 2016. These spreadsheets are detailed and show individual voter information (including name and address), the date of removal, and the reason for the removal of a voter. Among the reasons offered are "deceased," "moved out of county," and "returned mail, inactive 2 years." The spreadsheets establish that voters were indeed removed in 2014, despite the certification showing that no inactive voters were removed. As best as we can tell, the accuracy and authenticity of these spreadsheets is not disputed. Thus,

37

uncontroverted record evidence shows that voters <u>were</u> removed from the rolls during the relevant period, even though no inactive voters were removed for failure to vote in two consecutive general elections.

Ultimately, the district court's finding is not obviously incorrect. The trial court did not clearly err in concluding that Snipes made a reasonable effort to remove voters who were ineligible on account of death or change of address. Where the evidence reasonably could support multiple inferences, it is not our job to pick one inference over another or to otherwise second guess the district court's plausible factual findings and the inferences it has drawn from those facts. Here the district court explained in detail and justified its analysis of the record evidence at length. We can find no clear error in those findings.

* * *

The National Voter Registration Act requires the states (and as delegated by Florida, the counties) to employ a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible because of death or change of address. The statute provides one method -- the National Change of Address Process -- by which states may fulfill their obligations regarding change of address. The district court found that Snipes availed herself of this safe harbor. As for deceased registrants, there can be little doubt that the use of reliable death records and ongoing removals based on those records constitutes a reasonable

38

effort.  The district court also found that Snipes removed deceased voters daily based on information drawn from Florida Health Department records and the Social Security Death Index.  The district court did not err in its statutory interpretation and did not clearly err in its findings of fact.

**AFFIRMED.**