[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 17-15478

_____

REGIONS BANK,
an Alabama banking corporation,

Plaintiff-Counter-Defendant-Appellant-
Cross-Appellee,

*versus*

MARVIN I. KAPLAN,
an individual,

Defendant-Counter-Claimant-Cross-Claimant
Cross-Defendant-Appellee-Cross-Appellant,

BRIDGEVIEW BANK GROUP,

Counter-Defendant-Cross-Claimant-
Counter-Claimant-Appellee,

R1A PALMS, LLC,
a Florida limited liability company,
TRIPLE NET EXCHANGE, LLC,
MK INVESTING, LLC,
BNK SMITH, LLC,
BRIDGEVIEW BANKCORP, INC.,
et al.,

Defendants-Counter-Claimants,

LIGHTHOUSE POINTE, LLC,

Defendant-Cross-Defendant-
Appellee,

WELLS FARGO, N.A.,
a national banking association,
as successor by merger with Wachovia
Bank, N.A.,

Defendant.

_____

No. 18-13220

_____

REGIONS BANK,
an Alabama banking corporation,

Plaintiff-Counter Defendant-
Appellant,

*versus*

MARVIN I. KAPLAN,
an individual,
R1A PALMS, LLC,
a Florida limited liability company,
TRIPLE NET EXCHANGE, LLC,
MK INVESTING, LLC,
BNK SMITH, LLC, et al.,

Defendants-Counter Claimants-
Appellees,

LIGHTHOUSE POINTE, LLC,
WELLS FARGO, N.A.,
a national banking association, as
successor by merger with Wachavia

4                    Opinion of the Court                    17-15478

Bank, N.A.,

Defendants-Cross Defendants-
Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:12-cv-01837-EAK-MAP

_____

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM, and LUCK, Circuit Judges.

LUCK, Circuit Judge:

Regions Bank sued Marvin Kaplan and the companies[1] he controlled to recover unpaid overdraft fees resulting from a check kiting[2] scheme run by Gary Todd Smith and his company, Smith Advertising and Associates. *See United States v. Smith*, 853 F. App'x 589, 590–91 (11th Cir. 2021) (discussing the scheme). Kaplan

---

[1] We refer to Kaplan and his companies collectively as "Kaplan."

[2] "Check kiting is the practice of writing a check against a bank account where funds are insufficient to cover it and hoping that before it is presented for payment to the payor bank, covering deposits (real or feigned) will have been made. In effect, to kite a check is to use a bad check to temporarily obtain credit." *United States v. Morales*, 978 F.2d 650, 653 n.6 (11th Cir. 1992).

countersued and also joined and crossclaimed against Bridgeview Bank Group—one of the banks where Smith had an account. After more than five years of litigation, the district court held a three-week bench trial and finally disposed of all the parties' claims. Both Regions and Kaplan appeal parts of the district court's dismissal order, summary judgment orders, and findings and conclusions after the bench trial; Kaplan appeals some of the magistrate judge's discovery orders; and Regions also appeals as insufficient the district court's order granting sanctions against Kaplan. After careful review of the record, and with the benefit of oral argument, we affirm.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 2008, Kaplan, through his companies, R1A Palms, LLC; Triple Net Exchange, LLC; MK Investing, LLC; and BNK Smith, LLC, started making short-term loans to Smith Advertising. Kaplan thought Smith needed the loans to take advantage of discounts offered by his printers for paying printing costs before they were due. Kaplan made the loans by wiring money to Smith's bank account at Bridgeview. Then, Smith would pay the loan back and split the printing discounts with Kaplan as interest on the loans. Between 2008 and 2011, Kaplan made hundreds of short-term loans to Smith as part of the scheme to split the printing discounts.

Then, in November 2011, Smith offered Kaplan an opportunity to participate in so-called "bundled loan deals." Smith told Kaplan that he found a way to "bundle" multiple print deals

6                       Opinion of the Court                 17-15478

together and time the payments to secure the printing discounts and repay the principal in a much shorter timeframe. Kaplan believed the bundled deals worked this way: (1) Smith and Kaplan would agree on a loan amount; (2) Smith would mail Kaplan checks and promissory notes reflecting the discounts, principal repayment, and incentive payments; (3) Kaplan would wire the loan amounts to Smith's account at Bridgeview; and (4) Kaplan would later receive the checks from Smith and deposit them, usually on the same day as the wire. Kaplan's companies each maintained a deposit account with Regions, which Kaplan used to facilitate the bundled loan deals. Regions's deposit account agreement required the account holder (Kaplan) to honor any payment made from an account and also required that any "special instructions" as to how Regions should handle the account be in writing.

On January 19, 2012, Kaplan and Smith agreed to the first bundled loan deal, and Smith mailed the corresponding checks and promissory notes to Kaplan. The next morning, Kaplan wired $9,700,000 to Smith. Later that morning, Kaplan received and deposited checks from Smith totaling $10,061,375. Regions provisionally credited—but did not "clear"—the deposited funds to Kaplan's accounts while it waited for Bridgeview to honor Smith's checks. This meant that the funds showed as "available" in Kaplan's account even though Bridgeview had not yet paid Regions. The next day, Kaplan internally transferred $2,000,000 between his accounts using the provisional availability from Smith's ten million dollar payment.

Smith and Kaplan then agreed to a second bundled loan deal, to take place on January 23, 2012. At 8:00 a.m. on January 23, Kaplan wired $10,450,000 to Smith. By 11:15 a.m., Kaplan received and deposited checks from Smith totaling $11,956,035. Later that day, Kaplan also agreed to participate in a third bundled loan deal.

But on the morning of January 24, 2012, before the third deal took place, Kaplan discovered that Regions hadn't credited the second deal checks to his accounts. Kaplan called Regions, and the Regions employee told him that a hold had been placed on the checks. Regions later gave Kaplan written notice that Bridgeview wouldn't honor the first deal and second deal checks. Bridgeview marked the dishonored checks with the return code: "Refer to Maker."

After the first deal checks were dishonored, Smith sent Kaplan replacement checks from his account at Wells Fargo Bank. Kaplan received and deposited the Wells Fargo checks, but they too were dishonored. Because Kaplan had wired out the provisionally credited funds from the dishonored checks, Kaplan's accounts were overdrawn, and he incurred more than six million dollars in overdraft fees. After the checks were dishonored, Regions reported Kaplan—and his social security number—to Wells Fargo, the Secret Service, and Fraud-Net, a fraud database run by the Florida Bankers Association, accusing him of check kiting.

Regions also sued Kaplan in Florida state court to recover the overdraft fees resulting from the dishonored first deal checks. Regions asserted claims for conversion, fraudulent concealment,

aiding and abetting fraudulent concealment, civil conspiracy, breach of contract, transfer-warranty liability (as codified at Florida Statutes section 674.207), chargeback/refund liability (as codified at Florida Statutes section 674.2141), and indorser liability (as codified at Florida Statutes section 673.4151).

Kaplan countersued Regions for defamation, "false light" invasion of privacy, negligence, and negligent misrepresentation. Kaplan alleged that Regions was liable for defamation and invasion of privacy because it: (1) sued Kaplan and accused him of check kiting; (2) reported Kaplan to Fraud-Net; and (3) told Wells Fargo and the Secret Service that Kaplan had kited checks. And Kaplan alleged that Regions had acted negligently by provisionally crediting the funds to his account and by representing to him that he had sufficient funds to make the wire transfers.

Kaplan also joined Bridgeview as a third-party defendant and raised six crossclaims against it: conspiracy to defraud; breach of Florida Uniform Commercial Code section 4-302(a); breach of 12 C.F.R. section 229; fraud; negligence; and negligent misrepresentation. Kaplan alleged that Bridgeview fraudulently induced him to wire additional funds into Smith's account by marking Smith's dishonored checks as "Refer to Maker" (which was, Kaplan argued, an improper return designation) and Bridgeview acted negligently by failing to return the dishonored checks with a proper return designation in a timely manner. Bridgeview removed the case to the Middle District of Florida.

### A.    Regions's Motion to Dismiss

Regions moved to dismiss Kaplan's defamation and invasion of privacy counterclaims.  It argued that Kaplan's defamation claim was barred by Florida's litigation privilege, and, thus, Regions was entitled to absolute immunity for suing Kaplan and accusing him of check kiting.  Regions also argued that it was entitled to a qualified privilege for reporting Kaplan to Fraud-Net, Wells Fargo, and the Secret Service because Kaplan had not alleged that Regions acted with express malice and the acts were done in good faith "with an interest to be upheld" and "limited in scope to a specific purpose and published on a proper occasion and manner."  Lastly, Regions argued that Kaplan's invasion of privacy claim failed because Florida did not recognize a "false light" invasion of privacy tort.

The district court granted Regions's motion to dismiss with prejudice. It concluded that Florida's litigation privilege provided Regions absolute immunity for suing Kaplan and accusing him of check kiting because those actions "relate[d] to" Regions's claims against Kaplan.  The district court also concluded that Regions had a qualified privilege for reporting Kaplan to Fraud-Net, Wells Fargo, and the Secret Service because the reports were made in good faith with an interest to be upheld.  The defamation claim failed, the district court determined, because Kaplan hadn't pleaded that Regions made the report with express malice.  Finally, the district court interpreted Kaplan's "false light" invasion of privacy claim as one for "public disclosure of private facts" and dismissed it

with prejudice because Fraud-Net was a secured, online database and Regions's publication of Kaplan's social security number did not constitute publication to the general public or "to so many persons that the information was substantially certain to become public knowledge."

After the district court granted the motion, Kaplan filed an amended complaint reasserting—verbatim—the defamation and invasion of privacy claims that had been dismissed with prejudice. In response, Regions sought statutory sanctions, 28 U.S.C. § 1927, and sanctions under the district court's inherent authority because Kaplan refiled without permission the same claims that had been dismissed with prejudice. Regions separately moved for rule 11 sanctions because Kaplan had acted with an improper, harassing purpose in refiling the claims. The district court re-dismissed the claims, but deferred ruling on sanctions until the end of the case.

B.      *Kaplan's Motions to Compel Discovery*

During discovery, Kaplan moved to compel production of documents pertaining to Bridgeview and Regions's handling of Smith's account and their fraud-prevention policies and procedures. Regions opposed Kaplan's discovery requests because they were "overbroad" and "impose[d] undue burdens on Regions," Smith's account records were protected by Florida law, and the Bank Secrecy Act prohibited Regions from disclosing suspicious activity reports. Bridgeview also opposed Kaplan's discovery requests because they were overbroad and sought disclosure of information protected by federal law.

After a hearing, the magistrate judge denied Kaplan's motion to compel production as to Bridgeview and denied part of his motion as to Regions.  The magistrate judge explained that he denied the motion because Kaplan's discovery requests were overbroad and asked for suspicious activity reports that were protected from disclosure by the Bank Secrecy Act.  Kaplan did not seek review by the district court of the denial of his discovery motions.

### C.      Motions for Summary Judgment

#### 1.  Bridgeview's Motion for Summary Judgment

Bridgeview sought summary judgment on Kaplan's crossclaims, arguing that it could not be held liable for violating Florida Uniform Commercial Code section 4-302(a) or 12 C.F.R. section 229 by marking Smith's dishonored checks "Refer to Maker" because that marking was permissible under the then-existing regulations.  Kaplan's common-law claims of fraud, negligence, and negligent misrepresentation failed, Bridgeview continued, because they were preempted by the Florida Uniform Commercial Code and federal regulations.  And Bridgeview contended that Kaplan's conspiracy-to-defraud claim failed because there was no summary judgment evidence that Bridgeview knew about Smith's scheme or had agreed to conspire with Smith.

The district court granted summary judgment for Bridgeview on all six crossclaims.  As to the Florida Uniform Commercial Code and federal regulation claims, the district court concluded as a matter of law that "Refer to Maker" was an appropriate marking under the existing banking regulations.  As to the claims

for fraud, negligence, and negligent misrepresentation, the district court concluded that the claims were preempted by the Florida Uniform Commercial Code and federal regulations. And, as to Kaplan's conspiracy claim, it failed because there was no evidence that Bridgeview had "actual knowledge" of Smith's scheme.

### 2. Regions's Motion for Summary Judgment

Regions also moved for summary judgment. It argued that it was entitled to summary judgment on its non-tort claims against Kaplan (i.e., its breach of contract claim and its claims under Florida's transfer-warranty liability statute, chargeback/refund liability statute, and indorser liability statute). As to the breach of contract, Regions asserted that there was no dispute that the overdrafts in Kaplan's accounts were genuine and there was no dispute that, under its deposit agreement with Kaplan, he was liable for the overdrafts. As to the claims for transfer-warranty liability, chargeback/refund liability, and indorser liability, Regions argued that Kaplan was liable for the dishonored checks because Regions had transferred the money at Kaplan's direction and that Kaplan's defense—Regions's alleged failure to mitigate—was not valid under the deposit agreement.

Regions also moved for summary judgment on Kaplan's negligence and negligent misrepresentation counterclaims. Regions argued that it was entitled to summary judgment because it had not (negligently or otherwise) represented to Kaplan that Smith's funds had cleared into his account. And Kaplan did not check his bank balance before wiring money to Smith. So, even if

Regions had negligently stated that the funds from the dishonored checks were cleared, it did not cause Kaplan's injury.

The district court agreed across the board. It first granted summary judgment for Regions on its breach of contract and statutory claims. As to the breach of contract claim, the district court agreed that the deposit agreements required Kaplan to pay for the overdrafts and related fees, and that it was "undisputed that checks on which Regions extended provisional credit were dishonored and returned" after Kaplan had already wired out the provisional funds for "additional deals," resulting in the overdrafts. Therefore, it concluded, Kaplan was required by the deposit agreement to make up for the shortfall from the dishonored checks. And as to statutory claims for transfer-warranty liability, chargeback/refund liability, and indorser liability, the district court also concluded that, because Regions acted in good faith, any negligence or failure to mitigate was legally irrelevant. The district court also granted Regions summary judgment on Kaplan's negligence and negligent misrepresentation counterclaims because there was no evidence supporting Kaplan's allegation that Regions had represented to him that the funds were cleared before he wired the money to Smith.

### 3. Kaplan's Motion for Summary Judgment

Finally, Kaplan moved for summary judgment on Regions's remaining claims—conversion, fraudulent concealment, aiding and abetting fraudulent concealment, and civil conspiracy. He argued that he couldn't be held liable for conversion because Regions had not shown that he had taken "specific and identifiable" money.

Nor, he continued, did Regions prove the "unauthorized act" necessary to sustain an action for conversion.  As to the latter three claims—fraudulent concealment, aiding and abetting fraudulent concealment, and civil conspiracy—Kaplan insisted that he couldn't be liable because there was no evidence of his knowledge of the check kiting scheme.

The district court agreed only as to the conversion claim, concluding that Kaplan was entitled to summary judgment because Regions failed to show that he took "specific and identifiable money" and had not shown that he committed "an unauthorized act which deprived Regions of the funds."  But the district court denied summary judgment on Regions's remaining claims—fraudulent concealment, aiding and abetting fraudulent concealment, and civil conspiracy—because the evidence was disputed whether Kaplan knew he was kiting checks.

### D.    Bench Trial

The district court then held a three-week bench trial on Regions's claims for fraudulent concealment, aiding and abetting fraudulent concealment, and civil conspiracy.  At trial, there was no dispute that Smith had kited checks, but Kaplan testified that he didn't know about Smith's scheme.  The district court credited Kaplan's testimony and found that he didn't knowingly and intentionally engage in check kiting.  Thus, the district court entered judgment for Kaplan on Regions's remaining three claims.

E.      *Regions's Motion for Sanctions*

After the bench trial, but before the district court ruled, Regions renewed its motion for sanctions—under the district court's inherent authority, section 1927, and rule 11—against Kaplan, his counsel, Jon D. Parrish, and Parrish's law firm, Parrish, White & Yarnell, P.A.  Regions argued that sanctions were warranted because:  Kaplan reasserted defamation and invasion of privacy counterclaims after the district court had dismissed them with prejudice; and Kaplan alleged Regions was negligent without any evidentiary support.

As to rule 11 sanctions, the district court found that reasserting the dismissed defamation and invasion of privacy claims, "while troubling," was "relatively minor" and so a sanction award of $1,000 would sufficiently deter Parrish without the need to use section 1927 or its inherent authority.  But, as to Regions's requests for sanctions under section 1927 or the district court's inherent authority for litigating the negligence and negligent misrepresentation claims without evidentiary support, the district court declined to impose sanctions because "there was insufficient evidence to conclude" that Parrish had acted in bad faith.

II.     **STANDARDS OF REVIEW**

We review de novo the district court's dismissal of Kaplan's defamation and invasion of privacy claims, *Cambridge Christian Sch., Inc. v. Florida High Sch. Athletic Ass'n*, 942 F.3d 1215, 1229 (11th Cir. 2019), accepting only the "well-pleaded facts" in the complaint and any "reasonable inferences drawn from those facts,"

*Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003) (citation omitted).  *See* Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted and internal quotation marks omitted).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (citation and internal quotation marks omitted).

We review de novo the district court's grant of summary judgment, viewing the evidence and all factual inferences in the light most favorable to the nonmoving party.  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).  A district court should grant summary judgment only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

We review for clear error the district court's bench trial factual findings.  *Bellitto v. Snipes*, 935 F.3d 1192, 1197 (11th Cir. 2019).  "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Id.* (citation and internal quotation marks omitted).  "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it."  *Id.* at 1197–98 (citation omitted).

Finally, we review for abuse of discretion the district court's sanctions order and its denial of Kaplan's motions to compel discovery. *Hernandez v. Acosta Tractors Inc.*, 898 F.3d 1301, 1305 n.2 (11th Cir. 2018) (sanctions); *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 837 (11th Cir. 2006) (motion to compel).

## III.    DISCUSSION

Regions and Kaplan have both appealed the district court's orders and findings. We begin with Regions's arguments on appeal and then turn to Kaplan's.

### A.    *Regions's Appeal*

Regions appeals three of the district court's orders and findings. First, Regions argues that genuine issues of material fact precluded summary judgment for Kaplan on its conversion claim. Second, Regions contends that the district court's bench trial findings for Kaplan on its fraudulent concealment, aiding and abetting fraudulent concealment, and civil conspiracy claims were clearly erroneous because the evidence showed that Kaplan knew about the check kiting scheme. And third, Regions claims that the district court abused its discretion by awarding only $1,000 in sanctions against Kaplan's counsel.

### 1.  Regions's Conversion Claim

The district court entered summary judgment for Kaplan on Regions's conversion claim because Regions failed to show two of the required elements of conversion—"specific and identifiable money" and "an unauthorized act which deprive[d] [Regions] of

that money." Regions contends this was error because:  (a) the money was specifically identifiable since it derived from specific checks deposited en masse and was used specifically for outgoing wires; and (b) Kaplan's authorization to use the funds doesn't preclude an unauthorized act.

An action for conversion of money requires:  (1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so.  *See United States v. Bailey*, 419 F.3d 1208, 1214 (11th Cir. 2005) (discussing the elements of conversion under Florida law); *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1056 (Fla. Dist. Ct. App. 2008) (explaining that "[f]or money to be the object of conversion there must be an obligation to keep intact or deliver the specific money in question, so that money can be identified") (citation and quotation marks omitted).  Funds are specifically identifiable if "delivered at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the deposit, or where the wrongful possession of such property is obtained."  *Belford Trucking Co. v. Zagar*, 243 So. 2d 646, 648 (Fla. Dist. Ct. App. 1970) ("An example is where a specific sum of money is to be held in constructive trust until the occurrence of a specified event.").  Additionally, "an action for conversion of money can only be maintained where the money at issue has been kept separate."  *Transcapital Bank v. Shadowbrook at Vero, LLC*, 226 So. 3d 856, 864 (Fla. Dist. Ct. App. 2017) (citation

and quotation marks omitted); *see Walker v. Figarola*, 59 So. 3d 188, 190 (Fla. Dist. Ct. App. 2011) ("[I]n order for there to be a conversion where money is involved, there must be an obligation to keep intact or deliver the specific money in question, so that money can be identified." (citation and internal quotation marks omitted)). "The requirement that the money be identified . . . does not permit as a subject of conversion an indebtedness which may be discharged by the payment of money generally." *Belford Trucking Co.*, 243 So. 2d at 648.

Here, the money in Kaplan's accounts came from multiple checks that were not all deposited at once and that were moved and transferred between multiple accounts, with wires sent from different accounts over several days. The funds were deposited into demand deposit accounts, and they were not "kept separate" from Kaplan's other money in his accounts. *See Transcapital Bank*, 226 So. 3d at 864. Nor was Kaplan obligated by law or contract to "keep intact or deliver the specific money in question." *See Walker*, 59 So. 3d at 189. None of these facts suggest that the funds were "specific and identifiable" or could not "be discharged by the payment of money generally." *Belford Trucking Co.*, 243 So. 2d at 648. Because the funds were not "specific and identifiable," we need not consider whether Kaplan's use constituted an unauthorized act. The district court did not err in granting summary judgment for Kaplan on Regions's conversion claim.

2. Regions's Fraudulent Concealment, Aiding and Abetting
    Fraudulent Concealment, and Civil Conspiracy Claims

The district court held a bench trial on Regions's fraudulent concealment, aiding and abetting fraudulent concealment, and civil conspiracy claims. These three claims were based on Regions's allegation that Kaplan knew that he was check kiting with Smith. After three weeks of testimony, the district court found that Kaplan had no knowledge of the check kiting, so each of these claims necessarily failed. On appeal, Regions argues that this "is the rare bench fact-finding warranting reversal" because there was "overwhelming evidence that [Kaplan] knowingly kited."

Each of these claims required Kaplan to have knowledge of the check kiting scheme. *See Cote v. R.J. Reynolds Tobacco Co.*, 909 F.3d 1094, 1106 n.6 (11th Cir. 2018) (explaining that fraudulent concealment requires that "the defendant knew or should have known the material fact should be disclosed" under Florida law); *Sun Life Assurance Co. of Can. v. Imperial Premium Fin.*, 904 F.3d 1197, 1214 (11th Cir. 2018) (explaining that defendant's "knowledge of the fraud" is an element of aiding and abetting fraud under Florida law); *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. Dist. Ct. App. 1987) (explaining that a conspirator must "know of the scheme" to be held liable for civil conspiracy under Florida law). Because the district court did not clearly err by finding that Kaplan lacked knowledge of the kiting scheme, it was not error to rule for Kaplan on each of these claims.

At trial, Regions's expert testified that it was impossible to tell just by looking at Kaplan's account statements whether the checks he deposited were supported by sufficient funds—"You would have to look at the account balances in [Smith's] account." Regions argues that "[t]his did not apply to Kaplan given his knowledge of the Bundled Deal predicate and admitted manipulation of the float," (i.e., the provisionally available funds). But Kaplan never admitted that he was manipulating the float; rather, he specifically testified that he "never thought [he] was leveraging any float." Kaplan also testified that he didn't know whether Smith was leveraging the float because he "didn't know how much money [Smith] had in [his] bank [account]." Indeed, Kaplan testified that he didn't know that Smith had insufficient funds to cover the checks. Kaplan emphasized that he thought that "Smith had reserves" and that "[he] didn't know what was in [Smith's] account. This was only one deal to them."

Regions argues that Kaplan should've known that the bundled loan deals were fraudulent because the "[d]aily returns were absurd." However, Kaplan and Smith "completed hundreds of short[-]term loan transactions" between 2008 and 2011 without any issues. Kaplan "just knew [he] was making money, and [he] was going with it," so he didn't investigate when he started the bundled loan deals because "[e]verything was doing well."

After a three-week trial, the district court credited Kaplan's testimony and concluded that "there [was] no evidence that . . . Kaplan had actual knowledge that 'the transactions were not

legitimate.'"    Although Regions presented some evidence to the contrary, "choosing between plausible but competing views of the record is a classic exercise of a district court's factfinding function that we are not permitted to redo on appellate review." *NLRB v. Hartman & Tyner, Inc.*, 714 F.3d 1244, 1252 (11th Cir. 2013).  Indeed, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).  And "[t]he grip of the clearly erroneous standard is even tighter when the district court hears testimony, giving it the opportunity to observe the demeanor of witnesses*." W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1316 (11th Cir. 2018); *see also Anderson*, 470 U.S. at 575 ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.").

Here, the district court reasonably relied on Kaplan's testimony and his previous successful dealings with Smith and found that he did not know that Smith had insufficient funds in his account or that the bundled loan deals were fraudulent.  "[W]e are obliged to accept" the district court's findings of fact unless they are clearly erroneous.  *Eggers v. Alabama*, 876 F.3d 1086, 1094 (11th Cir. 2017).  And, after reviewing the entire record, we conclude that the district court's findings of fact are not clearly erroneous.

### 3. Regions's Motion for Sanctions

The district court imposed $1,000 in rule 11 sanctions on Kaplan's counsel, Parrish, and his law firm because Parrish refiled the defamation and invasion of privacy counterclaims after the district court dismissed them with prejudice.  Regions argues that the district court abused its discretion by:  (1) imposing only a $1,000 rule 11 sanction for refiling the defamation and invasion of privacy counterclaims after they were dismissed because it was too little to be an effective deterrent; (2) denying additional sanctions for the same conduct under section 1927 and the district court's inherent authority; and (3) denying sanctions for asserting negligence and negligent misrepresentation claims without sufficient evidence.  None of these alleged errors were an abuse of discretion.

The district court did not abuse its discretion in awarding $1,000 in rule 11 sanctions.  This court and our sister circuits have upheld or imposed sanctions of a similar size and found that they were a sufficient deterrent.  *See, e.g.*, *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1546 (11th Cir. 1993) (upholding $5,000 sanction for each defendant and $500 sanction for each defense attorney); *Clark v. United Parcel Serv., Inc.*, 460 F.3d 1004, 1011 (8th Cir. 2006) (concluding that "a sanction of $1,000 is reasonable and consistent with the principle that a sanction be 'limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated'") (quoting Fed R. Civ. P. 11(c)(2)); *Harrell v. United States*, 4 F.3d 996, 996 (7th Cir. 1993) (awarding $1,000 sanction to "deter future frivolous" filings).  "Familiar with

the issues and litigants, the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402 (1990).

Nor did the district court abuse its discretion in declining to award additional sanctions for the same conduct—reasserting the defamation and invasion of privacy counterclaims—under section 1927 or its inherent authority. "[B]ecause a court's inherent powers are so potent, they must be exercised with restraint and discretion." *Malautea*, 987 F.2d 1546. "[A] district court's authority to issue sanctions for attorney misconduct under [section] 1927 is either broader than or equally as broad as the district court's authority to issue a sanctions order under its inherent powers," *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007), so a district court's power under section 1927 should be subject to the same restraint. Because the district court had already awarded what it deemed to be sufficient sanctions under rule 11, it was not an abuse of discretion to refuse to award further sanctions under section 1927 or its inherent authority. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power.").

Finally, the district court did not abuse its discretion by declining to award sanctions on the negligence and negligent misrepresentation counterclaims. Regions argues that the district court

should have imposed sanctions because Kaplan asserted the negligence and negligent misrepresentation counterclaims without reasonable evidentiary support. In its view, because Kaplan couldn't recall any specific conversations with Regions or its employees to support his misrepresentation claim, had his counsel done the required prefiling factual inquiry, the claims never would have been filed.

But the factual record belies this contention. It was not sanctionable for Kaplan to argue that Regions acted negligently because Kaplan orally instructed Regions not to wire uncleared funds, even if the claim was eventually rejected.

"Although sanctions are warranted when the claimant exhibits a 'deliberate indifference to obvious facts,' they are not warranted when the claimant's evidence is merely weak but appears sufficient, after a reasonable inquiry, to support a claim under existing law." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998). Nor is it sanctionable conduct to argue for ultimately unsuccessful extensions of the existing law made in good faith. *See id.* ("[T]he purpose of Rule 11 is to deter frivolous lawsuits and not to deter novel legal arguments or cases of first impression."); *Laborers Loc. 938 Joint Health & Welfare Tr. Fund v. B.R. Starnes Co. of Fla.*, 827 F.2d 1454, 1458 (11th Cir. 1987) (holding that sanctions were not warranted where the issues "were fairly debatable and not easily resolved"); Fed R. Civ. P. 11(b)(2) (explaining that sanctions may not be awarded for "nonfrivolous argument for the extension,

modification, or reversal of existing law or the establishment of new law").

Here, Kaplan's claims survived Regions's motion to dismiss—they didn't suddenly become sanctionable when the district court granted summary judgment for Regions. While it is sanctionable to *knowingly* allege a claim without evidentiary support, the district court did not abuse its discretion in finding that Kaplan had made the allegations in good faith, even if his memory of his communications with Regions executing the wire transfer ultimately did not constitute a negligent misrepresentation. Thus, we conclude that the district court did not abuse its discretion in denying Regions's request for sanctions.

## B.     *Kaplan's Appeal*

This brings us to Kaplan's appeal. It can be divided into four parts. First, Kaplan argues that the district court erred by granting summary judgment for Regions on its breach of contract, transfer-warranty liability, chargeback/refund liability, and indorser liability claims.

Second, Kaplan contends that the district court shouldn't have dismissed his defamation and invasion of privacy counterclaims. And it shouldn't have granted summary judgment for Regions on his negligence, negligent misrepresentation, and fraud counterclaims.

Third, Kaplan argues that the district court erred by granting summary judgment for Bridgeview on his crossclaims under

section 302 of the Florida Uniform Commercial Code and 12 C.F.R. section 229 and his common-law fraud, negligence, and negligent misrepresentation crossclaims.

Fourth and finally, Kaplan contends that the magistrate judge abused his discretion by denying his motions to compel discovery into how Regions and Bridgeview handled Smith's account.

### 1.  Regions's Claims against Kaplan

Kaplan argues that the district court erred by granting summary judgment for Regions on its breach of contract claim and its statutory claims for transfer-warranty liability, chargeback/refund liability, and indorser liability.  We'll consider the deposit agreement claim first, and then consider the statutory claims together.

### a.  *Region's Breach of Contract Claim*

The district court granted summary judgment for Regions on its breach of contract claim, concluding that, as a matter of law, Kaplan was liable for the overdraft charges incurred when Bridgeview dishonored the first deal checks.  Kaplan argues that the district court failed to properly consider whether Regions mitigated its damages or acted in good faith and exercised ordinary care when it:  (a) provisionally credited the funds from Smith's checks and marked them "available"; (b) disregarded Kaplan's oral instruction to wire out only cleared funds; and (c) failed to discover Smith's check kiting scheme earlier.

But, as the district court explained, under Florida law, depository banks "generally have no duty to investigate transactions

made by authorized agents of the account holder." *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 948 n.7 (11th Cir. 2014). Rather, Regions was subject only to a duty of good faith and ordinary care. *See* Fla. Stat. § 674.103, cmt. 2 ("The agreements may not disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care . . . .").

Here, there was no genuine dispute that Regions acted in good faith and exercised ordinary care. First, Regions, "in accord with the Deposit Agreement" and "common practice in the banking industry," marked the provisionally credited funds as "available" the next day. The commentary to the Florida Uniform Commercial Code permits marking funds as provisionally available the next day—without waiting for them to clear—because "the vast majority" of checks are ultimately settled without issue. *See* Fla. Stat. § 674.2141 cmt. 1 ("Statistically, this practice of settling provisionally first and then awaiting final payment is justified because the vast majority of such cash items are finally paid, with the result that in this great preponderance of cases it becomes unnecessary for the banks making the provisional settlements to make any further entries."). In other words, there was no evidence that Regions's acceptance of Smith's checks and its marking of the funds as available the next day was a failure to exercise ordinary care.

Second, Kaplan's oral instruction not to wire uncleared funds didn't create an issue of fact as to Regions's good faith and ordinary care because the deposit agreements required any special instructions from the account holder to be in writing. Thus,

Kaplan's oral instruction not to wire uncleared (but provisionally available) funds couldn't override the express terms of the deposit agreement.  Regions acted in good faith and with ordinary care in abiding by the express terms of its deposit agreement with Kaplan.

And third, Regions had no duty to investigate Smith's suspicious activity, *see Lamm*, 749 F.3d at 948 n.7, so it couldn't have been a breach of its obligation to act in good faith when it failed to discover Smith's check kiting scheme—a scheme which, the district court found, even Kaplan didn't know about.

In sum, the district court correctly granted summary judgment to Regions on its breach of contract claim because there was no genuine dispute that Regions acted in good faith when it provisionally credited funds to Kaplan's account for the ultimately dishonored first deal checks.

b.  *Regions's Statutory Claims:  Transfer-Warranty Liability, Chargeback/Refund Liability, and Indorser Liability*

Kaplan next argues that the district court erred by granting summary judgment for Regions on its statutory claims for breach of Florida's transfer-warranty liability, chargeback/refund liability, and indorser liability statutes because the district court failed to consider whether Regions acted in good faith.  Again, he faults Regions for:  (a) providing provisional funds and marking them "available"; (b) disregarding Kaplan's oral instruction to wire out only cleared funds; and (c) not discovering the check kiting sooner.

Taking the transfer-warranty liability and chargeback/refund liability statute claims first, both require only that Regions act in good faith.  *See* Fla. Stat. § 674.207(2)–(3) (requiring that the check be accepted "in good faith"); *id.* § 674.2141(4)(b) ("The right to charge back is not affected by . . . [f]ailure by any bank to exercise ordinary care with respect to the item . . . ."); *see also id.* § 674.2141(4)(b) cmt. 5 ("[C]harge-back is permitted even if non-payment results from the depositary bank's own negligence.  The customer's protection is found in the general obligation of good faith . . . .").  Good faith means "honesty in fact and the observance of reasonable commercial standards of fair dealing."  *Id.* § 673.1031(1)(d).  The "honesty in fact" component is subjective, requiring "actual, not constructive, knowledge of the wrongdoing tantamount to dishonesty or bad faith."  *See Any Kind Checks Cashed, Inc. v. Talcott*, 830 So. 2d 160, 164–65 (Fla. Dist. Ct. App. 2002) (citation omitted).  The fair-dealing component is objective.  *Id.*  "Although fair dealing is a broad term that must be defined in context, . . . it is concerned with the fairness of conduct rather than the care with which an act is performed.  Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transaction." Fla. Stat. § 673.1031 cmt. 4.

Again, the summary judgment evidence is undisputed that Regions acted in good faith.  There was no evidence that Regions had actual knowledge of the check kiting scheme.  Nor is there any question that Regions acted fairly; as discussed above, it acted

consistently with its deposit agreement, and with industry practice in making funds available the next day.  Fla. Stat. § 674.2141 cmt. 1. Although the deposit account agreements permitted Kaplan to give special written instructions to the contrary, he failed to do so. Thus, the district court correctly granted summary judgment on Regions's transfer-warranty liability and chargeback/refund liability claims.

For the same reasons, the district court did not err in concluding that Kaplan was liable under Florida's "indorser liability statute"—section 673.4151(1)(a)[3]—because Regions indorsed the checks on Kaplan's behalf pursuant to the deposit agreements. Kaplan argues that Regions was required to act in good faith and exercise ordinary care in making these indorsements based on an implied covenant of good faith and fair dealing in each deposit agreement. But, to the extent Regions had a duty of good faith and ordinary care in indorsing the checks, Kaplan has identified no evidence that it breached that duty.

2.  Kaplan's Counterclaims against Regions

Kaplan argues that the district court erred in granting Regions's motion to dismiss his counterclaims for defamation and invasion of privacy,  and in granting summary judgment for Regions

---

[3] Section 673.4151(1)(a) provides that:  "if an instrument is dishonored, an indorser is obliged to pay the amount due on the instrument: (a) [a]ccording to the terms of the instrument at the time it was indorsed . . . ."  Fla. Stat. § 673.4151(1)(a).

on his counterclaims for negligence and negligent misrepresentation. We address each in turn.

### a.  Kaplan's Defamation Counterclaim

The district court granted Regions's motion to dismiss Kaplan's defamation claim because Florida's qualified privilege applied to Regions's reporting to Fraud-Net and the Secret Service that it suspected Kaplan of check kiting. Kaplan argues that the district court erred by dismissing his defamation claim because he sufficiently pleaded express malice, negating Regions's qualified privilege.

Florida law provides a common law "qualified privilege" against defamation claims for communications made in good faith between persons with a common interest in the subject matter of the communications. *See, e.g.*, *Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984) ("A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation.") (citation omitted). This qualified privilege changes the plaintiff's burden of proof: "in order for the plaintiff to recover, he is called upon affirmatively and expressly to show malice in the publisher." *Coogler v. Rhodes*, 21 So. 109, 112 (Fla. 1897).

Here, Regions, Fraud-Net, and the Secret Service had a common interest in preventing check kiting. The disclosure to the

Secret Service also benefited from a presumptively qualified privilege because it was made to law enforcement. *See Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992) ("[D]efamatory statements voluntarily made by private individuals to the police or the state's attorney prior to the institution of criminal charges are presumptively qualifiedly privileged." (footnote omitted)).

Although "[t]he existence of a qualified privilege vanishes if the statement is made with malice," *Healy v. Suntrust Serv. Corp.*, 569 So. 2d 458, 460 (Fla. Dist. Ct. App. 1990), it was Kaplan's burden to plead this, *Nodar*, 462 So. 2d at 810 (noting that "[t]he privilege . . . raises a presumption of good faith and places upon the plaintiff the burden of proving express malice"). "[T]he gravamen of express malice is the abuse of a privileged occasion by improper motives on the part of the speaker." *Id*, at 811 n.8. "Where a person speaks upon a privileged occasion, but the speaker is motivated more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege, then it can be said that there was express malice and the privilege is destroyed." *Id.* at 811. "Strong, angry, or intemperate words do not alone show express malice; rather, there must be a showing that the speaker used his privileged position 'to gratify his malevolence.'" *Id.* (citation omitted). But, "[i]f the occasion of the communication is privileged because of a proper interest to be protected, and the defamer is motivated by a desire to protect that interest, he does not forfeit the privilege merely because he also in fact feels hostility or ill will toward the plaintiff." *Id.* at 811–12.

Kaplan argues that this allegation was enough to allege express malice:

> In fact, . . . Regions sought only to discredit Kaplan in an effort to distract attention from the fact that, had [it] followed [its] own procedures or proper banking practice, the Investment Companies owned by Kaplan would not have lost millions of dollars to the Conspirators because they would have known that the first checks had not cleared Bridgeview and would not have invested, and potentially lost, the additional funds.

But this allegation does not demonstrate that Regions was "motivated more by a desire to harm the person defamed" or that Regions sought to "gratify [its] malevolence." *Id.* at 811. Instead, it showed only that Regions was motivated in part by a desire "to distract attention" from its financial losses. Kaplan, therefore, failed to allege that Regions acted "with the primary motive of gratifying ill will, hostility, and [its] desire to harm" Kaplan. *See Crestview Hosp. Corp. v. Coastal Anesthesia, P.A.*, 203 So. 3d 978, 983 (Fla. Dist. Ct. App. 2016). Accordingly, the district court didn't err by concluding that Kaplan failed to plead express malice, and it therefore properly dismissed Kaplan's defamation counterclaim.

### b. *Kaplan's Invasion of Privacy Counterclaim*

The district court also granted Regions's motion to dismiss Kaplan's counterclaim for invasion of privacy. In Florida, the tort of invasion of privacy includes publication of private facts. *Jews for*

*Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1102 (Fla. 2008) (explaining that invasion of privacy consists of three distinct torts: (1) intrusion upon the seclusion of another; (2) commercial appropriation of one's name or likeness; and (3) publication of private facts). To establish a claim for publication of private facts, a plaintiff must show "[1] the publication, [2] of private facts, [3] that are offensive, and [4] are not of public concern." *Cape Publ'ns, Inc. v. Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989). Kaplan argues that the district court erred in concluding that Regions's alleged publication of his social security number to Fraud-Net didn't satisfy the publication requirement because Fraud-Net was "widely available to numerous agencies and/or fields." Kaplan's argument fails for three reasons: he didn't plead facts satisfying the publication requirement; and even if he had, he failed to plead facts demonstrating that the publication was offensive and not of public concern.

"[T]he publicity given to private facts must be to the public at large or to so many persons that the matter must be regarded as substantially certain to become public knowledge." *Williams v. City of Minneola*, 575 So. 2d 683, 689 (Fla. Dist. Ct. App. 1991). The district court took judicial notice of the fact that Fraud-Net is "a dynamic, secured, online database created to help financial institutions and law enforcement in the fight against financial crime," and that "[o]nly banks, credit unions and law enforcement agencies may register for 'Fraud-Net.'"[4] Because Fraud-Net is both secured

---

[4] Kaplan appears to fault the district court for taking judicial notice of what Fraud-Net is. The district court did not err by taking judicial notice of these

and restricted to limited membership, a submission to Fraud-Net is not a disclosure to the public at large or a disclosure that is substantially certain to become public knowledge.

Kaplan also didn't satisfy the offensiveness requirement. Although private, publication of a social security number is not offensive. *See Post-Newsweek Stations Orlando, Inc. v. Guetzloe*, 968 So. 2d 608, 613 (Fla. Dist. Ct. App. 2007) (concluding that the publication of "medical records of [plaintiff] and his family, and communications between [plaintiff] and his attorneys," was not highly offensive "merely because of their nature"); *In re Haley*, 418 B.R. 432, 437 (Bankr. M.D. Fla. 2009) (finding it "clear" that the publication of certain information, including an unredacted social security number, was "not deemed to be highly offensive to a reasonable person").

Finally, Kaplan didn't satisfy the no-public-concern requirement. "The right of privacy does not prohibit the publication of matter which is of legitimate public or general interest. At some

facts. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). After all, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Kaplan has given us no reason to doubt the accuracy of the facts judicially noticed by the district court.

point the public interest in obtaining information becomes dominant over the individual's desire for privacy." *Jews for Jesus*, 997 So. 2d at 1104 (internal quotation omitted); *see also Valentine v. C.B.S., Inc.*, 698 F.2d 430, 432 (11th Cir. 1983) ("[U]nder Florida law the publication of facts regarding matters of legitimate public or general interest will not support an invasion of privacy action."). "[T]he requirement of lack of public concern is a formidable obstacle." *Cape*, 549 So. 2d at 1377. Here, there was a legitimate public interest in preventing bank fraud. *See Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 43 (1980) ("[P]rotecting the citizenry against fraud [is] undoubtedly [a] legitimate state interest[]."); *see also United States v. Berroa*, 856 F.3d 141, 171 (1st Cir. 2017) (Lipez, J., concurring in part and dissenting in part) ("The bank fraud statute, by contrast, is based upon an interest in preventing federally regulated and insured banks from being victimized by fraud."); *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 503 (5th Cir. 2001) (holding that there is a "legitimate state interest[]" in preventing "frauds, unfair practices, discrimination, impositions, and other abuses of [its] citizens") (cleaned up). Publication of Kaplan's suspected fraud and his social security number on Fraud-Net served that interest because it allowed banks and law enforcement to identify potentially fraudulent accounts and transactions. Although the publication of a social security number generally may not be in the public interest, in the context of preventing bank fraud through limited disclosure on a secure and limited network designed expressly for the purpose of preventing bank fraud, publication served the public interest.

c.  *Kaplan's Negligence and Negligent Misrepresentation Counterclaims*

Kaplan argues that the district court erred in granting summary judgment for Regions on his negligence and negligent misrepresentation counterclaims because:  (a) Regions acted unreasonably in provisionally crediting funds; (b) Regions should have known about the check kiting; and (c) the district court failed to consider whether Regions acted consistently with reasonable industry standards.  These arguments fail for many of the same reasons we discussed above.

Regions did not act negligently in provisionally crediting funds.  Florida Statutes chapter 674 expressly permits banks to provisionally credit funds.  Fla. Stat. § 674.104(1)(k) ("A settlement may be either provisional or final.").  "Action or nonaction approved by [chapter 674] is the exercise of ordinary care; and, in the absence of special instructions, action or nonaction, consistent with . . . a general banking usage not disapproved by [chapter 674] is prima facie the exercise of ordinary care."  *Id.* § 674.103(3).  As discussed above, provisionally crediting funds is also consistent with industry practice.  *See id.* § 674.2141 cmt. 1.  And Regions did not act negligently in failing to discover the check kiting because, as we explained previously, Regions had no duty to investigate.  *Lamm*, 749 F.3d at 948 n.7 ("[T]he Florida Supreme Court and this Court have held that [depository banks] generally have no duty to investigate transactions made by authorized agents of the account holder.").

Finally, Regions did not make any negligent misrepresentations to Kaplan. Kaplan's theory is that he thought the funds had cleared because they were in his account and he had previously told a Regions employee orally that only cleared funds should be marked as available. So, when he checked his balance and saw "available funds," he interpreted it to mean cleared funds.

To state a claim for negligent misrepresentation, a plaintiff must show that: (1) "the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false; (2) the defendant was negligent in making a statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation." *Spec. Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 309 (Fla. Dist. Ct. App. 2011) (cleaned up).

But Kaplan could not justifiably rely on a purported oral agreement with a Regions employee that it would wire only cleared funds because the agreement was contrary to the deposit agreements and not in writing (as was required by the deposit agreements). For example, one of the deposit agreements said that Kaplan "acknowledge[d] and agree[d] that no . . . oral representations or communications . . . which vary the terms and conditions of this Agreement shall constitute a modification or amendment of the terms and conditions of this Agreement."

Kaplan's testimony also eviscerated his claim. Kaplan testified that Regions never told him the funds he wired had cleared.

And, Kaplan admitted at deposition that he had "heard of available funds" but that "[he] just didn't believe they were cleared funds." So, when Regions informed Kaplan about his "available funds," Kaplan could not claim that he reasonably believed that the sum referred to his "cleared" funds. Accordingly, the district court did not err in entering summary judgment in favor of Regions.

### 3. Kaplan's Crossclaims against Bridgeview

Kaplan appeals the district court's summary judgment for Bridgeview on his Florida Uniform Commercial Code section 4-302, 12 C.F.R. section 229, fraud, negligence, negligent misrepresentation, and conspiracy crossclaims. We consider each in turn.

### a. *Kaplan's Florida Uniform Commercial Code section 4-302 and 12 C.F.R. section 229 Crossclaims*

Under Florida Uniform Commercial Code section 4-302 and 12 C.F.R. section 229, if a bank does not pay a check written by one of its account holders, it must promptly return it to the depository bank and include a reason for nonpayment. 12 C.F.R. § 229.31 ("If a paying bank determines not to pay a check in the amount of $5,000 or more, it shall provide notice of nonpayment [to the depositary bank within two days]."); *id.* ("A paying bank returning a check shall clearly indicate on the front of the check that it is a returned check and the reason for return."); Fla. Stat. § 674.402(3) ("A payor bank's determination of the customer's account balance on which a decision to dishonor for insufficiency of available funds is based may be made at any time between the time the item is received by the payor bank and the time that the payor bank returns

the item or gives notice in lieu of return, and no more than one determination need be made.").

In this case, Bridgeview—the payor bank—refused to pay Smith's checks and marked them "Refer to Maker." Kaplan contends that "Refer to Maker" isn't a valid designation, relying on proposed revisions to the regulations requiring banks to "clearly indicate on the front of the check that it is a returned check and the reason for return." *See* Availability of Funds and Collection of Checks, 76 Fed. Reg. 16877 (proposed Mar. 25, 2011). In these revisions, Kaplan notes, the Board of Governors of the Federal Reserve proposed changing the existing guidance to provide that "'Refer to Maker' by itself," is not "an appropriate reason for return in any case." *Id.*

At the time of the transactions at issue, however, the proposed change hadn't gone into effect yet—thus "Refer to Maker" was a valid return code. *See* 12 C.F.R. § 229, app. E. ("A reason such as 'Refer to Maker' may be appropriate in certain cases . . . ."). Therefore, there was no genuine dispute that Bridgeview complied with the applicable federal regulations.

Further, the statute underlying Kaplan's cause of action, 12 U.S.C. section 4010(e), provides that no bank can be held liable for "any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Board of Governors of the Federal Reserve System, notwithstanding the fact that after such act or omission has occurred, such rule, regulation, or interpretation is amended, rescinded, or determined by judicial or other

authority to be invalid for any reason." Because—at the time—the regulations provided that "Refer to Maker" was an available and appropriate return designation, Bridgeview was not liable for following the federal banking regulations. *See* 12 C.F.R. § 229, app. E.

Lastly, Kaplan doesn't contest the district court's conclusion that Bridgeview used the "Refer to Maker" for appropriate reasons. As Bridgeview explained below, it used the "Refer to Maker" designation because it had started but not yet finished closing the account; since the account wasn't closed yet, no other return reason was appropriate.

In sum, there was no genuine dispute that Bridgeview acted appropriately by marking the dishonored first and second deal checks "Refer to Maker."

### b. *Kaplan's Fraud, Negligence, and Negligent Misrepresentation Crossclaims*

The district court also entered summary judgment for Bridgeview on Kaplan's fraud crossclaim (for fraudulently inducing Kaplan to wire additional funds into Smith's account by using the "Refer to Maker" designation) and negligence and negligent misrepresentation crossclaims (for failing to return the bounced checks with a proper return designation in a timely manner). The district court granted summary judgment because these claims were directed at the same conduct asserted in Kaplan's statutory "Refer to Maker" crossclaims, and, thus, were "displaced by" the Florida Uniform Commercial Code and the federal regulations. Kaplan argues

that the district court erred by determining that his common law crossclaims were preempted and by ignoring evidence of Bridgeview's knowledge of Smith's scheme.  We disagree.

All of Kaplan's allegations pertain to Bridgeview's use of the "Refer to Maker" designation and are covered by federal regulations and the Florida Uniform Commercial Code, Article 4 (Florida Statutes Chapter 674).  The federal statute authorizing Kaplan's "Refer to Maker" claim, 12 U.S.C. section 4007(b), provides that "[t]his chapter and regulations prescribed under this chapter," including 12 C.F.R. section 229.31(e), "supersede any provision of the law of any State, . . . which is inconsistent with this chapter or such regulations."  Similarly, under Florida law, where the Florida Uniform Commercial Code regulates "exactly the same duty" as existed under common law, then the Florida Uniform Commercial Code preempts the common-law cause of action.  *Corfan Banco Asuncion Para. v. Ocean Bank*, 715 So. 2d 967, 971 (Fla. Dist. Ct. App. 1998).  So, both the federal regulations and Florida law preempt Kaplan's common law crossclaims.

In this case, federal regulations require a bank to provide a reason for the return of a check.  12 C.F.R. § 229.31(e) ("A paying bank returning a check shall clearly indicate on the front of the check that it is a returned check and the reason for return.").  And the Florida Uniform Commercial Code governs the "methods of sending and presenting" checks. Fla. Stat. §§ 674.204, .301. Because the use of the "Refer to Maker" return code is covered by Florida's

Uniform Commercial Code and federal regulations, Kaplan's claims are preempted.

Kaplan argues that these claims aren't preempted because Bridgeview knew illegal activity was occurring in Smith's account. Kaplan points to Smith's bank statements and an affidavit from Bridgeview's president explaining that Bridgeview decided to close Smith's account due to the increased volume of wire transfers.

Although knowledge of the underlying fraud can overcome statutory preemption in some circumstances, *see, e.g., Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1279 (11th Cir. 2003) (holding that the Florida Uniform Commercial Code "does not preempt a state law claim if money is transferred by wire to a party that knows or should have known that the funds were obtained illegally"), this evidence is insufficient to establish Bridgeview's knowledge of Smith's illegal scheme.  Even in the light most favorable to Kaplan, neither Bridgeview's president's affidavit nor Smith's bank statements show that Bridgeview knew or should have known about the fraud.  At most, the number of wires gave Bridgeview reason to be suspicious about the account activity, but suspicion about account activity is not the same as knowledge of the underlying fraud.  And Kaplan doesn't allege that Bridgeview deliberately shut its eyes to fraud such that it "should have known." *See Schmidt v. McKay*, 555 F.2d 30, 37 (2d Cir. 1977) ("[A]lthough a plaintiff may not shut his eyes to facts which call for investigation, mere suspicion will not suffice as a ground for imputing knowledge of the fraud."); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 469 (S.D.N.Y.

2008) ("Even where a bank was on notice of 'red flags' that indicated certain accounts may have been vehicles for fraudulent activity and referred the case to its internal fraud unit, the bank had only suspicions but not actual knowledge of the fraud."). Without any other evidence supporting his assertion that Bridgeview knew about Smith's fraud, the district court properly granted summary judgment on Kaplan's fraud claim.

### c. *Kaplan's Conspiracy to Defraud Crossclaim*

Finally, the district court also granted summary judgment for Bridgeview on Kaplan's claim that Bridgeview conspired with Smith to defraud because there was no evidence that Bridgeview had actual knowledge of the scheme or that it provided anything other than routine check processing for Smith's checking account. Kaplan argues that three pieces of evidence show that this was error: (1) that Bridgeview "engaged in a high risk practice of allowing continuous negative balances in the [Smith] account[] for long periods of time, creating very serious questions about [Bridgeview]'s participation and motives"; (2) that Bridgeview "sudden[ly] deci[ded] to close the [Smith] account, and subsequent[ly] delay[ed] in closing the account until January 24"; and (3) that Bridgeview used the "Refer to Maker" designation.

Even in the light most favorable to Kaplan, none of these facts create a triable issue of fact as to whether Bridgeview engaged in a conspiracy to defraud Kaplan. First, as we already explained, Bridgeview's use of the "Refer to Maker" designation was appropriate under the circumstances because it was a permissible return

code under then-existing federal regulations.  Second, as discussed above, Bridgeview's president explained that Bridgeview closed Smith's account because of the increased volume of wire transfers, and allowed Smith to keep his account open for a short period "out of common courtesy" to give Smith "ample notice and an opportunity to establish a new banking relationship."  Without other evidence, it's not a reasonable inference that Bridgeview actually did so to enable Smith's check kiting scheme.  And third, although there were "intraday provisionally negative account balances," Bridgeview explained that the bank was "never at risk as the account was always positive by the time checks were paid."  Kaplan points us to no conflicting evidence establishing a genuine issue of material fact.  Based on the summary judgment record, no reasonable jury could find that Bridgeview knew about the fraud or conspired with Smith.  Kaplan relies on implausible inferences, which are insufficient to survive summary judgment.  *See Matsuhita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 593 (1986) ("[C]ourts should not permit factfinders to infer conspiracies when such inferences are implausible . . . .").

### 4.  Kaplan's Motions to Compel Discovery

Before trial, Kaplan moved to compel discovery of Regions's and Bridgeview's handling of Smith's account—including whether there were any suspicious activity reports related to the account—to determine whether Regions and Bridgeview exercised reasonable care and acted in good faith.  Regions and Bridgeview both opposed the requests because, they contended, any suspicious activity

reports were privileged and because the requests were overbroad. A magistrate judge denied Kaplan's request for discovery as it related to Bridgeview and denied it in part as to Regions. Kaplan did not seek review of the magistrate judge's order by the district court, but he now contends that the magistrate judge abused its discretion because the suspicious activity report privilege didn't apply.

Kaplan's failure to seek review of the magistrate judge's order by the district court is fatal. *See, e.g.*, *Smith v. School Bd. of Orange Cnty.*, 487 F.3d 1361, 1365 (11th Cir. 2007) ("[W]here a party fails to timely challenge a magistrate's nondispositive order before the district court, the party waived his right to appeal those orders in this [c]ourt."). "A party may not assign as error a defect in [a non-dispositive] order not timely objected to." Fed. R. Civ. P. 72(a). Thus, Kaplan has forfeited any argument that the magistrate judge abused its discretion.

**AFFIRMED.**